Brenda **ALDERMAN** et al., **Plaintiffs,**

v.

The **PHILADELPHIA HOUSING AUTHORITY** et al., **Defendants.**

**Civ. A. No. 73-766.**

United States District Court, E. D. Pennsylvania.

Sept. 24, 1973.

Bruce E. Endy, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Harold Cramer, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

NEWCOMER, District Judge.

Presently before the Court is the above captioned plaintiffs' motion for a declaratory judgment requesting that their terminations of employment by the defendants be adjudged a violation of their right to freedom of speech as guaranteed and protected by the First Amendment of the United States Constitution and the Civil Rights Act of 1871, Act of April 20, 1871, Chapter 22, Section 1, 17 Stat. 13, 42 U.S.C.A. § 1983. Also before the Court is the above captioned plaintiffs' motion for a permanent injunction requesting the defendants be compelled to rescind the plaintiffs' terminations, and to restore them to their former employment with back pay at six per cent interest, and seniority retroactive to the dates of their terminations.

On April 2, 1973, the plaintiffs, four former non-tenured employees of the defendant, Philadelphia Housing Authority, filed a Complaint and Motion for a Preliminary Injunction averring that their discharge from the Philadelphia Housing Authority for failure to agree not to interfere with an upcoming Philadelphia Housing Authority tenants' election, regarding the Resident Advisory Board of Philadelphia, Inc., violated their right to freedom of speech. The Plaintiffs also averred that a memorandum circulated by the Philadelphia Housing Authority was vague and over-

broad, and for that reason, unconstitutional. Furthermore, the plaintiffs averred that their discharge was unlawful because the Philadelphia Housing Authority failed to give them a prior evidentiary hearing.

On April 13, 1973, the plaintiffs withdrew their motion for a preliminary injunction. Thereafter, the Philadelphia Housing Authority filed an answer to the complaint and a motion to dismiss. The bases of the defendants' motion were as follows:

A. The Philadelphia Housing Authority's discharge of the plaintiffs for failure to sign the above mentioned memorandum and to agree not to interfere with the upcoming Resident Advisory Board election was a reasonable exercise of proper authority and was necessary to serve certain enumerated and significant governmental interests of the Philadelphia Housing Authority;

B. The memorandum was neither vague nor overbroad, and the plaintiffs were fully aware of and understood the limitations it put on their activities; and

C. The plaintiffs, who were non-tenured employees of the Philadelphia Housing Authority, had no right to a prior hearing before their discharge.

On May 15, 1973, this Court granted the defendants' motion in part, and held that the memorandum in question was "neither vague nor overbroad nor violative of any constitutional right" and that the defendants' discharge of the plaintiffs was not unlawful because of the defendants' failure to give the plaintiffs a prior hearing. An evidentiary hearing was ordered on the plaintiffs' motion for a declaratory judgment that their firings were in violation of their right to freedom of speech and on the plaintiffs' motion for a permanent injunction compelling the defendants to rescind the plaintiffs' firings, and to restore them to their former employment with back pay plus six per cent interest and seniority retroactive to the dates of their firings.

The full and final evidentiary hearing was held on May 18, 1973, and the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The plaintiff Brenda Alderman is an adult citizen of the United States and a resident of the Commonwealth of Pennsylvania. Plaintiff Alderman was first hired by the Philadelphia Housing Authority on July 10, 1972, as a Tenant Service Representative II (N.T. pp. 5–6). More specifically, she was hired to provide social services to tenants living in the public housing managed by the Philadelphia Housing Authority (N.T. p. 9). At the time her employment with the Philadelphia Housing Authority was terminated, her salary was $9,467.00 per annum (N.T. p. 24).

2. The plaintiff Floyd Smith is an adult citizen of the United States and a resident of the Commonwealth of Pennsylvania. Plaintiff Smith was first hired by the Philadelphia Housing Authority on April 20, 1970, as a Resident Aide Coordinator. More specifically, he was hired to work with teenagers who lived in public housing to help curb gang warfare in the areas to which he was assigned. (N.T. p. 54). Mr. Smith's starting salary with the Philadelphia Housing Authority was $8,183.00 per annum (Exhibit P-7). Mr. Smith's salary at the time his employment was terminated by the Philadelphia Housing Authority was $9,635.00 per annum. See Affidavit of Floyd Smith, Exhibit "D", in Plaintiffs' Motion for Summary Judgment.

3. The plaintiff Jerri Williams is an adult citizen of the United States and a resident of the Commonwealth of Pennsylvania. Plaintiff Williams was first hired by the Philadelphia Housing Authority on October 26, 1971, as a Group Service Worker. More specifically, she was hired to help public housing tenants organize and run recreational, social and

educational programs; a job she was doing as a volunteer before being hired by the Philadelphia Housing Authority (N.T. pp. 31–32). At the time plaintiff Williams' employment with the Philadelphia Housing Authority was terminated, her salary was $227.00, net, every two weeks (N.T. pp. 88–89).

4. The plaintiff Kay Deming is an adult citizen of the United States and a resident of the Commonwealth of Pennsylvania. Plaintiff Deming was first hired by the Philadelphia Housing Authority on January 10, 1972 as an Area Coordinator. (N.T. pp. 69–70). More specifically, she was hired to provide coordination, training, staff development, and program supervision for the Social Services Programs run by the Philadelphia Housing Authority in their West Philadelphia projects. (N.T. p. 71). At the time plaintiff Deming's employment with the Philadelphia Housing Authority was terminated, her salary was $13,300 per annum. (N.T. p. 81).

5. The defendant, The Philadelphia Housing Authority, was created under the provisions of the Housing Authorities Law, Act of May 28, 1937, P.L. 955, 35 P.S. § 1541 et seq. for the primary purpose of providing safe and sanitary housing to low income persons. (Answer ¶ 8).

6. The defendant Gilbert Stein was Executive Director of the Philadelphia Housing Authority from August 21, 1972 until February 20, 1973. (N.T. p. 119).

7. As Executive Director of the Philadelphia Housing Authority, Stein was chief executive officer of the Philadelphia Housing Authority and was in charge of all executive and administrative functions of the Philadelphia Housing Authority (Deposition of Gilbert Stein p. 4).

8. Each of the plaintiffs was employed by the Philadelphia Housing Authority as a probationary employee before each became a permanent status employee of the Philadelphia Housing Authority (N.T. pp. 7, 34, 56, 70, 71).

9. The plaintiffs Brenda Alderman and Jerri Williams were, themselves, public housing tenants while they were employed at the Philadelphia Housing Authority (N.T. pp. 5, 6, 30).

10. The defendant Thomas J. Kelly is presently the Acting Executive Director of the Philadelphia Housing Authority (Answer ¶ 9).

11. The defendants Thomas McIntosh, Carmelita Larner, Frosteena Kee, and William Rafsky are presently the members of the Philadelphia Housing Authority's Board of Directors (Answer ¶ 10). The Board of Directors is responsible for setting the broad managerial policy of the Philadelphia Housing Authority (Exhibit P–17, pp. 4–6).

12. At the time Stein became Executive Director of the Philadelphia Housing Authority, the Philadelphia Housing Authority and the Resident Advisory Board were involved in an ongoing dispute as to whether the Resident Advisory Board properly represented tenants of the Philadelphia Housing Authority and whether it was responsive to those tenants' needs. (N.T. pp. 122–133).

13. Shortly after he became Executive Director of the Philadelphia Housing Authority, Stein, at the request of members of the Philadelphia Housing Authority, entered into an investigation of the Resident Advisory Board to determine whether the Resident Advisory Board truly and properly represented Philadelphia Housing Authority tenants as it claimed, and whether it was responsive to the tenants' needs. (N.T. pp. 117–133).

14. During the course of that investigation, Stein visited the Philadelphia Housing Authority's projects and personally conducted inspections and interviewed tenants (N.T. pp. 117–133).

15. That investigation revealed that many tenants believed that the Resident Advisory Board, far from representing their needs, was in a conspiracy with the Philadelphia Housing Authority to take advantage of the tenants and to perpetuate itself for its own self-aggran-

dizement (N.T. pp. 122–133). This was confirmed in the mind of many tenants by the refusal of the Resident Advisory Board to deal with the dope pusher problem; the highly publicized conviction of Rose Wylie, the then head of the Resident Advisory Board, for extortion; and the fact that many Resident Advisory Board members were not Philadelphia Housing Authority tenants (N.T. pp. 122–133).

16. As a result of that investigation, and to fully and finally determine whether the Resident Advisory Board truly represented the tenants, Stein, in early October of 1972, proposed a free and open tenant plebiscite, said plebiscite to be held in December of 1972 (N.T. p. 132).

17. From its negotiations with the Resident Advisory Board, which had been continuing for some months prior to October of 1972, the Philadelphia Housing Authority felt certain, that the Resident Advisory Board would charge the Philadelphia Housing Authority with interfering with the tenants' election and seek to enjoin it. From at least two of Mr. Stein's personal experiences with the Resident Advisory Board, he felt certain that if the Philadelphia Housing Authority employees did compaign against the Resident Advisory Board, violence would erupt between the Philadelphia Housing Authority employees and the Resident Advisory Board advocates (N.T. pp. 122–133).

18. In this atmosphere and in anticipation of a suit by the Resident Advisory Board, Stein, in November of 1972, directed that the following memorandum ("the memorandum") be issued to all employees:

TO: All Employees of The Philadelphia Housing Authority

FROM: Gilbert Stein, Executive Director

SUBJECT: Activities of PHA Personnel during the Tenants Election

No PHA employee shall engage in any form of interference during the upcoming tenant plebiscite to determine whether residents of PHA-managed properties want to be represented by the RAB Corporation (Resident Advisory Board of Philadelphia).

It is the policy of this Authority to encourage all tenants to exercise their right to choice . . . but there should be no attempt by PHA employees to discuss RAB politics with tenants, either pro or con.

Any employee who engages in such activity will be subject to immediate dismissal.

/s/ Gilbert Stein
_____

I have read the above and understand that as an employee of The Philadelphia Housing Authority, I must abide by this restriction.
_____
Employee's Signature

(Exhibit P–2)

19. The purpose of the memorandum, the reasons for its issuance, and the governmental interests served by it, were as follows:

(a) The memorandum was issued to insure a free and open election without interference, either pro or con, by Philadelphia Housing Authority employees (N.T. pp. 131–137).

(b) The memorandum was issued to prevent violent confrontations of the type which had occurred on two prior occasions during disputes between the Philadelphia Housing Authority and the Resident Advisory Board (N.T. pp. 137, 148, 149).

(c) The memorandum was issued to protect the tenants' rights of freedom of expression and freedom of choice in representation with regard to the election (Affidavit of Gilbert Stein, N.T. pp. 131, 133–137).

(d) The Philadelphia Housing Authority tenants were dependent on social workers and other Philadelphia Housing Authority employees for the necessities of life, and would therefore be subject to intentional or unintentional coercion by the social workers and other Philadelphia Housing Authority employees to vote the way the

tenant thought the Philadelphia Housing Authority employee wanted him or her to vote. (Affidavit of Gilbert Stein, N.T. pp. 131, 133, and 137).

(e) If the Philadelphia Housing Authority employees were allowed to campaign for or against the Resident Advisory Board, the tenants might erroneously come to believe, or continue to believe, that the Resident Advisory Board and the Philadelphia Housing Authority were secretly acting in concert (N.T. pp. 133–140).

(f) The Philadelphia Housing Authority employees might devote their time and efforts to campaigning for or against the Resident Advisory Board, rather than devoting their energies to their regular duties (N.T. p. 137).

(g) The memorandum was necessary to preserve the Philadelphia Housing Authority's public integrity in that, the Philadelphia Housing Authority should not, through its employees or otherwise, take or appear to take a position, either way, with reference to the Resident Advisory Board election or controversy (N.T. pp. 133–137).

(h) If the Philadelphia Housing Authority employees were allowed to campaign during the election, the results of the election might be set aside (N.T. p. 165).

20. On December 5, 1972, as anticipated by the Philadelphia Housing Authority, the Resident Advisory Board and several individual Philadelphia Housing Authority tenants, not parties to this case, but rather suing on their own behalf and in a representative capacity for all Philadelphia Housing Authority tenants, brought suit in this Court naming the Philadelphia Housing Authority as defendant and seeking to enjoin the upcoming election. That suit was captioned: Resident Advisory Board of Philadelphia, Inc. v. Philadelphia Housing Authority, Civil Action No. 72–2399 ("the RAB case") (N.T. pp. 134, 136). As a result of the Resi-

dent Advisory Board litigation, the election scheduled for December of 1972 was called off by the Philadelphia Housing Authority. This cancellation took place on December 11, 1972 (N.T. p. 155; Exhibit P–18), and another election was scheduled for either April or May of 1973 (N.T. p. 164).

21. After extensive negotiations, the Philadelphia Housing Authority and the Resident Advisory Board entered into a stipulation dated December 11, 1972, approved by The Honorable Charles R. Weiner of this Court, which read in part as follows:

The Philadelphia Housing Authority agrees that it will not take a position on the election provided for above. This shall not prevent PHA from answering any criticisms of its personnel or policies (Exhibit D–3).

22. In November of 1972, when the defendant Stein ordered his memorandum (P–2) circulated, he ordered his subordinate senior staff members to distribute the memorandum to all Philadelphia Housing Authority employees, to have said employees sign the memorandum, and to have the signed memorandum returned to Miss Karen Vandenhengle, who was at that time an Administrative Assistant in the Philadelphia Housing Authority personnel department (N.T. pp. 91–93, Exhibit P–17b, p. 75, Exhibit P–15).

23. As requested by her superiors, Miss Vandenhengle maintained records of all Philadelphia Housing Authority employees who did not sign the defendant Stein's memorandum (N.T. p. 93). Her records revealed that 65 to 70 Philadelphia Housing Authority employees failed to sign Mr. Stein's memorandum and, except for the four plaintiffs in this action, all of those 65 to 70 employees are still working for the Philadelphia Housing Authority and were not dismissed from their jobs for their failure to sign the defendant Stein's memorandum (N.T. pp. 93–95).

24. An examination of Miss Vandenhengle's records revealed that about 14

persons out of the 65–70 gave "reasons" why they had not signed (Exhibit P–16). These "reasons" included the fact that the 14 persons may have been on annual leave (vacation) or sick leave (N.T. pp. 100–102, 108).

25. A few days prior to December 8, 1972, each of the plaintiffs—Alderman (N.T. pp. 9–12), Williams (N.T. p. 36), Smith (N.T. p. 57), and Deming (N.T. p. 73)—received the Stein memorandum, and each refused to sign it or return it as instructed.

26. Although they refused to sign the memorandum (Exhibit P–2), none of the plaintiffs, in fact, ever interfered in the Resident Advisory Board election referred to in the memorandum, nor did any of the plaintiffs, in fact, ever discuss the election or Resident Advisory Board politics, pro or con, with public housing tenants prior to their dismissal (Alderman, N.T. pp. 12–13), (Williams, N.T. pp. 43–44), (Smith, N.T. pp. 63–64), (Deming, N.T. pp. 79–80). See also N.T. pp. 147–148.

27. The plaintiff Kay Deming responded to Stein's memorandum by setting down in a lengthy letter, delivered to Miss Vandenhengle, her reasons why she would not sign the memorandum (N.T. pp. 73–74, Exhibit P–12). However, she never received a response to that letter (N.T. p. 74).

28. On December 19, 1972, eight days after the Resident Advisory Board election was called off, Kay Deming was called into the office of the personnel director and told that she was fired (N.T. p. 76, Exhibit P–13). The defendant Stein later told Miss Deming that she was fired for failing to sign the memorandum in question (N.T. pp. 77–78, 138).

29. None of the other three plaintiffs received any word from the Philadelphia Housing Authority about their failure to sign the memorandum (Exhibit P–2), until they were telephoned on December 27, 1972 and told to report to the office of Natalie Danowsky, the Director of Social Services. At the time of the phone call, each of the plaintiffs were on the job at the Philadelphia Housing Authority, except for Jerri Williams, who was at home on annual leave (N.T. pp. 37–39). When each plaintiff arrived to speak to Miss Danowsky, they were each handed a letter advising them that they had failed to sign the memorandum and that they must sign it or be fired (Alderman, N.T. pp. 14, 18–19, Exhibit P–3), (Williams, N.T. pp. 37–39), (Smith, N.T. pp. 58–59, Exhibit P–8). In addition, the letter stated that each of the plaintiffs would be placed on three months probation even if they did sign the memorandum (Exhibits P–3 and P–8).

30. Brenda Alderman made repeated attempts to talk with the defendant Gilbert Stein before the December 29, 1972 deadline, but she was unsuccessful. She believed that under certain conditions, she could have signed the memorandum. Miss Alderman was eventually able to speak to the defendant Stein on January 4, 1973, about her dismissal, but he refused to discuss the matter with her (N.T. p. 22). On January 5, 1973, she received notice that she had been terminated from her job as of December 27, 1972 (N.T. pp. 20–21, Exhibit P–4). The plaintiff Brenda Alderman was dismissed from her job because she would not sign Mr. Stein's memorandum (N.T. pp. 22, 138, Exhibit P–5).

31. The plaintiff Jerri Williams assumed that she would be fired as of December 29, 1972 if she refused to sign the memorandum. She heard nothing further from the Philadelphia Housing Authority until, by phone, in January, she made arrangements to pick up her final paycheck (N.T. 40–41). In fact, Mrs. Williams was dismissed from her job at the Philadelphia Housing Authority as of December 29, 1972, because she failed to sign the memorandum (N.T. pp. 40–41, 138, Exhibit P–6).

32. The plaintiff Floyd Smith did not sign the "memorandum" as a result of his discussion with Miss Danowsky (N.T. p. 61). However, believing that the memorandum might be associated

with the then pending Resident Advisory Board v. Philadelphia Housing Authority lawsuit, he decided to sign the memorandum if Miss Danowsky would agree that, as she led him to believe, the memorandum and the lawsuit were connected to one another (N.T. pp. 62–64). To indicate his willingness to sign, he delivered a letter to the Philadelphia Housing Authority receptionist on December 29, 1972, since Miss Danowsky had left for the day. Mr. Smith never received a response to his letter (N.T. pp. 62–63, Exhibit P–9). While Mr. Smith never received any formal notice of his dismissal, he was dismissed as of December 29, 1972 for his failure to sign the memorandum (N.T. pp. 64–65, 138, Exhibit P–10).

33. On May 9, 1973, this Court, through the Honorable Charles R. Weiner, entered an order in the Resident Advisory Board case which, in part, enjoined the Philadelphia Housing Authority and its employees from uttering any written or oral statement regarding its opinion or preference in the upcoming Resident Advisory Board election. The pertinent part of that order provides as follows:

> Neither through "The Good Neighbor" or any other written or published notice or statement, nor through any oral statement issued or made in any manner by the Philadelphia Housing Authority *or any of its employees,* shall the Housing Authority make known or otherwise publish to the public housing tenants its opinion or preference as to the persons or organizations which shall represent the public housing tenants or their dealings with the Housing Authority, nor shall the Housing Authority offer any promise or benefit to any person for the purpose of influencing any eligible voter on how he shall cast his vote (N.T. pp. 166–167, Emphasis supplied).

34. By issuing the above quoted order, Judge Weiner indicated that the enjoining of interference with reference to the Resident Advisory Board election was proper and constitutional, and served a significant interest, i.e. a free and open election, which far outweighed any infringement upon the rights of Philadelphia Housing Authority employees.

35. More Philadelphia Housing Authority employees were disposed to campaign against the Resident Advisory Board than in favor of it (N.T. pp. 139–140).

36. In mid November of 1972, Stein directed that all Philadelphia Housing Authority employees, without exception, be told that if they did not sign the memorandum by December 26, 1972, they would be suspended until December 29, 1972, without pay. If they did not sign the memorandum by December 29, 1973, they would be discharged (Exhibit B to the Complaint).

37. Stein himself signed the memorandum (N.T. p. 162).

38. Of the more than 1,300 employees of the Philadelphia Housing Authority, the records of the Philadelphia Housing Authority show that only the plaintiffs herein *refused* to sign the memorandum; although, approximately 65 other Philadelphia Housing Authority employees did not return the memorandum to Karen Vandenhengle. The Philadelphia Housing Authority records do not show that these 65 refused to sign the memorandum, but rather that most of the 65 were either on sick leave, annual leave, or shift work (N.T. pp. 93–97).

39. The memorandum in question is neither vague not overbroad. Its import and restrictions were understood by the plaintiffs. (Order of this Court dated May 15, 1973 dismissing Count II of the Complaint).

40. All four plaintiffs understood the meaning and import of the memorandum and they further understood that if they did not sign the memorandum, they would be discharged.

41. The plaintiff Brenda Alderman was, at the time the memorandum in question was issued, and at the time of

her dismissal, a nontenured employee of the Philadelphia Housing Authority (N. T. pp. 7–9).

42. Alderman was a graduate of the University of Illinois with a Bachelor of Science degree in Social Welfare (N.T. p. 24).

43. At the time of her dismissal, Brenda Alderman was not a public housing tenant (N.T. p. 5).

44. Brenda Alderman was familiar, or should have been familiar, with the "RAB politics" to which the memorandum referred (N.T. p. 6).

45. Brenda Alderman received the memorandum and was asked to sign it (N.T. p. 10).

46. Brenda Alderman refused to sign the memorandum (N.T. p. 14).

47. Brenda Alderman was given an opportunity to explain her reasons for not signing the memorandum and to ask questions about it (N.T. p. 14).

48. Brenda Alderman again refused to sign the memorandum, and as a result of her refusal, she was discharged on December 27, 1972 (N.T. pp. 20–21, Exhibit P–4).

49. Alderman did not make any attempt to seek employment until February of 1973. Thereafter, she spent most of her time home reading (N.T. p. 29).

50. The plaintiff Jerri Williams was at the time the memorandum in question was issued, and at the time of her dismissal, a nontenured employee of the Philadelphia Housing Authority (N.T. p. 31).

51. Jerri Williams served as president of the Norris Tenant Council from 1968 until 1970. The Norris Tenant Council is associated with the Resident Advisory Board (N.T. p. 46).

52. Jerri Williams was employed by the Resident Advisory Board from March of 1969 through June of 1969 (N.T. p. 45).

53. Jerri Williams was familiar, or should have been familiar, with the "RAB politics" to which the memorandum referred (N.T. pp. 45–47).

54. Jerri Williams was asked to sign the memorandum (N.T. pp. 35–36).

55. Jerri Williams refused to sign the memorandum (N.T. p. 36).

56. Jerri Williams was given an opportunity to explain her refusal to sign the memorandum and ask questions about it (N.T. pp. 36–37).

57. Jerri Williams was again asked to sign the memorandum (N.T. pp. 36–37).

58. Jerri Williams again refused to sign the memorandum, and as a result, she was discharged by the Philadelphia Housing Authority on December 29, 1972 (N.T. pp. 37, 40–41).

59. Jerri Williams did not begin to look for work until two weeks after her dismissal (N.T. pp. 46–47).

60. Jerri Williams again worked for the Resident Advisory Board from February of 1973 until April 30 of 1973, when she was terminated because of frequent absences (N.T. pp. 46–47).

61. On May 18, 1973 (the day of the hearing in this case), Jerri Williams was again a member of the Norris Homes Tenant Council which is associated with the Resident Advisory Board (N.T. pp. 49–50).

62. The plaintiff Kay Deming was at the time the memorandum in question was issued, and at the time of her dismissal, a nontenured employee of the Philadelphia Housing Authority (N.T. pp. 69–70).

63. Kay Deming is a graduate of Louisiana State University with a bachelor's degree in Secondary Education, and she has one year towards a master's degree in Social Work from the Bryn Mawr Graduate School of Social Work (N.T. p. 69).

64. Kay Deming distributed the memorandum in question to the employees under her supervision including plaintiff Floyd Smith and asked them to sign it (N.T. pp. 56–57, 72, 82–83).

65. At the time of the distribution of the memorandum, Kay Deming was familiar or should have been familiar with

the "RAB politics" to which the memorandum referred (N.T. pp. 69, 80–81).

66. Kay Deming was asked to sign the memorandum (N.T. pp. 71–73).

67. Kay Deming refused to sign the memorandum (N.T. p. 73).

68. Kay Deming was given an opportunity to express her reasons for refusing to sign the memorandum and to ask questions about it (N.T. pp. 73–74).

69. Kay Deming again refused to sign the memorandum, and as a result of this, she was discharged by the Philadelphia Housing Authority on January 2, 1973 (N.T. pp. 73–74, 76).

70. Since February 12, 1973, Kay Deming has been employed by the Pennsylvania Social Services Union (N.T. pp. 80–81).

71. The plaintiff Floyd Smith was at the time the memorandum in question was distributed, and at the time of his dismissal, a nontenured employee of the Philadelphia Housing Authority (N.T. p. 54).

72. Until October of 1972, Floyd Smith was a member of the Resident Advisory Board (N.T. p. 67).

73. Floyd Smith served as president of a Tenant Council affiliated with the Resident Advisory Board (N.T. p. 67).

74. At the time of the distribution of the memorandum, Floyd Smith was familiar or should have been familiar with the "RAB politics" mentioned in the memorandum (N.T. p. 67).

75. Floyd Smith was asked to sign the memorandum (N.T. pp. 56–57).

76. Floyd Smith refused to sign the memorandum (N.T. p. 57).

77. Floyd Smith was given an opportunity to express his reasons for refusing to sign the memorandum and to ask questions about it (N.T. p. 58).

78. Floyd Smith was again asked to sign the memorandum (N.T. p. 58).

79. Floyd Smith again refused to sign the memorandum and as a result of this, he was dismissed by the Philadelphia Housing Authority on December 29, 1972. (N.T. pp. 61, 64–65).

80. Floyd Smith is employed at the Mantua Community Center and is attending the Wharton School of the University of Pennsylvania three nights a week (N.T. pp. 66–69).

81. The defendant Gilbert Stein ceased being Executive Director of the Philadelphia Housing Authority on February 20, 1973. At no time after the issuance of the memorandum in question, and while he was in the office of Executive Director, did Stein discuss "RAB politics" with tenants or interfere in an election involving the Resident Advisory Board (N.T. p. 138).

## DISCUSSION

In mid-November of 1972, the Philadelphia Housing Authority circulated the following memorandum to *all* of its employees:

No PHA employee shall engage in any form of interference during the upcoming tenant plebiscite to determine whether residents of PHA-managed properties want to be represented by the RAB Corporation (Resident Advisory Board of Philadelphia).

It is the policy of this Authority to encourage all tenants to exercise their right of choice . . . but there should be no attempt by PHA employees to discuss RAB politics with tenants, either pro or con.

Any employee who engages in such activity will be subject to immediate dismissal.

/S/ Gilbert Stein

I have read the above and understand that as an employee of the Philadelphia Housing Authority, I must abide by this restriction.

Employee's Signature

Gilbert Stein, the then Executive Director of the Philadelphia Housing Authority, instructed his staff to discharge any Philadelphia Housing Authority employee who refused to sign the memorandum and abide by its terms. Each of the plaintiffs, all of whom were employees of the Philadelphia Housing

Authority, *refused* to sign the memorandum, even after personal interviews with their supervisors, and in the case of Brenda Alderman and Kay Deming, after personal interviews with Gilbert Stein.

The purpose of the memorandum, and the Philadelphia Housing Authority's interest served by it, are intimately related to a long-standing controversy between the Philadelphia Housing Authority and the Resident Advisory Board. That controversy eventually came before the Honorable Charles R. Weiner of this Court in a case captioned Resident Advisory Board of Philadelphia, Inc., et al. v. The Philadelphia Housing Authority, U.S.D.C.E.D.Pa., Civil Action No. 72–2399 ("The RAB case"). The history of that case is as follows:

In August of 1972, shortly after he was appointed Executive Director of the Philadelphia Housing Authority, Gilbert Stein, at the request of the Philadelphia Housing Authority Board of Directors, entered into an investigation of the Resident Advisory Board to determine whether the Resident Advisory Board truly represented the Philadelphia Housing Authority tenants as it claimed, and whether it was responsive to tenants' needs. This investigation disclosed that many tenants believed that the Resident Advisory Board, far from representing their needs, was in a conspiracy with the Philadelphia Housing Authority to take advantage of them and to perpetuate itself for its own self-aggrandizement. This was confirmed in many tenants' minds by the refusal of the Resident Advisory Board to deal with "dope pushers" and the highly-publicized conviction of Rose Wylie, then head of the Resident Advisory Board, for extortion. It was a firm belief of many tenants that the Philadelphia Housing Authority not only acquiesced in the Resident Advisory Board's illicit activities, but encouraged them. The Resident Advisory Board, on the other hand, charged the Philadelphia Housing Authority with interference in its right to represent tenants.

To finally and fully determine whether the Resident Advisory Board truly represented the Philadelphia Housing Authority tenants, the Philadelphia Housing Authority, in early October of 1972, proposed a free and open plebiscite to take place in December of 1972. It was clear to the Philadelphia Housing Authority, from its negotiations with the Resident Advisory Board, which had been continuing for some months prior thereto, that the Resident Advisory Board would charge the Philadelphia Housing Authority with interfering with the election and seek to enjoin it. It was also clear to Mr. Stein, based on two personal experiences with the Resident Advisory Board, that if Philadelphia Housing Authority employees did campaign against the Resident Advisory Board, violence would erupt between those employees and the Resident Advisory Board advocates.

It was in this atmosphere, and in anticipation of a lawsuit by the Resident Advisory Board, that the above quoted memorandum was circulated among Philadelphia Housing Authority employees. The purpose of the memorandum was to:

(a) Insure a free and open election without interference, either pro or con, by Philadelphia Housing Authority employees;

(b) Prevent charges that the Philadelphia Housing Authority attempted to influence the votes of tenants in the election, charges which if proven could void the election;

(c) Prevent disruption of services by the Philadelphia Housing Authority to tenants which might be caused by the political campaigning of Philadelphia Housing Authority employees in the election;

(d) Prevent disruption and even violence which might be caused by Philadelphia Housing Authority employees' interference in the election; and

(e) Protect Philadelphia Housing Authority tenants' rights of free

speech, free association, and due process. Many tenants of the Philadelphia Housing Authority are dependent for their subsistence upon welfare payments and social welfare services administered by Philadelphia Housing Authority employees. To have permitted those Philadelphia Housing Authority employees to campaign, either for or against the Resident Advisory Board, might have caused the tenant to believe that if a tenant did not vote the way his social worker directed him to vote, his welfare benefits and services would be terminated, thereby creating an impermissible "chilling effect" upon the tenant's constitutional rights.

On December 5, 1972, as anticipated by the Philadelphia Housing Authority, the Resident Advisory Board brought an action against the Philadelphia Housing Authority seeking an injunction to prohibit the pending election. After extensive negotiations, the parties entered into a stipulation which was approved by Judge Weiner.

Paragraph 5 of that stipulation formalized the Philadelphia Housing Authority's undertaking not to participate in the election, and provided in part:

> The Philadelphia Housing Authority agrees that it will not take a position in the election provided for above.

Compliance with the stipulation necessarily required the full cooperation and assistance of all Philadelphia Housing Authority employees, since the Philadelphia Housing Authority, like any other organization, can act only through its officers and employees.

Thereafter, on May 9, 1973, Judge Weiner entered an Order in "the RAB case" which, in part, enjoined the Philadelphia Housing Authority and its employees from uttering any written or oral statement regarding its opinion or preference in the upcoming Resident Advisory Board election. The pertinent part of that Order provides as follows:

> Neither through "The Good Neighbor" or any other written or published notice or statement, *nor through any oral statement* issued or made in any manner by the Philadelphia Housing Authority or any of its employees, shall the Housing Authority make known or otherwise publish to the public housing tenants its opinion or preference as to the persons or organizations which shall represent the public housing tenants or their dealings with the Housing Authority. Nor shall the Housing Authority offer any promise or benefit to any person for the purpose of influencing any eligible voter on how he shall cast his vote. (Emphasis supplied)

The stipulation, and especially Judge Weiner's injunction in "the RAB case", are of great significance to the instant case. They both are evidence that this Federal District Court believed that enjoining interference with the Resident Advisory Board election was proper and constitutional and served a significant governmental interest of the Philadelphia Housing Authority which far outweighed any infringement upon the rights of the Philadelphia Housing Authority employees.

This Court, by Order of May 15, 1973, found that the memorandum in question was neither vague nor overbroad. Each of the plaintiffs understood its import, and each was fully aware of the Philadelphia Housing Authority's sensitive position, and later each became aware of the stipulation with the Resident Advisory Board and the injunction against the Philadelphia Housing Authority. Nevertheless, after being given several opportunities to sign the memorandum, the plaintiffs refused to signify their willingness to abide by the memorandum's terms. As a result, they were discharged from the Philadelphia Housing Authority.

■ The plaintiffs now claim that their dismissal was violative of their right to freedom of speech, and that they should be reinstated with back pay. Two recent Supreme Court decisions are dispositive of this case. In United States Civil Service Commission et al. v.

National Association of Letter Carriers, AFL–CIO, et al., 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and Broadrick et al. v. State of Oklahoma et al., 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), the United States Supreme Court reaffirmed the government's right to restrict the speech of its employees.

In the *Letter Carriers* case, the Supreme Court reversed the decision in National Association of Letter Carriers v. United States Civil Service Commission, 346 F.Supp. 578 (D.C.D.C.1972), which was heavily relied upon by the plaintiffs therein and reaffirmed the government's right to restrict the political activities of its employees under the Hatch Act, 5 U.S.C.A. § 7324(a)(2). In rejecting the plaintiffs' contention that the Hatch Act prohibition on political activity was unconstitutional on its face, the Supreme Court, quoting from Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), held that:

> The government has an interest in regulating the conduct and "the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act. 413 U.S. 564, 93 S.Ct. 2890, 37 L.Ed.2d 808.

The Court went on to hold that:

> Neither the right to associate nor the right to participate in political activities is absolute in any event. See, e. g., Rosario v. Rockefeller, 410 U.S. 752 [93 S.Ct. 1245, 36 L.Ed.2d 1] (1973); Dunn v. Blumstein, 405 U.S. 330, 336 [92 S.Ct. 995, 999, 31 L.Ed. 2d 274] (1972); Bullock v. Carter, 405 U.S. 134, 140–141 [92 S.Ct. 849, 854–855, 31 L.Ed.2d 92] (1972); Jenness v. Fortson, 403 U.S. 431 [91 S.Ct. 1970, 29 L.Ed.2d 554] (1971); Williams v. Rhodes, 393 U.S. 23, 30–31 [89 S.Ct. 5, 10–11, 21 L.Ed.2d 24] (1968). (413 U.S. 567, 93 S.Ct. 2891, 37 L.Ed.2d 810).

In the instant case, the Philadelphia Housing Authority had a significant and immediate governmental interest in preventing interference with the Resident Advisory Board plebiscite. Conversely, the plaintiffs claim that they did not even intend to discuss Resident Advisory Board politics, let alone, to interfere with the election. The only reason why the plaintiffs refused to sign the memorandum was because they "thought" that it infringed on their absolute right to freedom of speech. On the one hand, we have the possibility of riots, contempt citations for violations of stipulations and injunctions, coercion of tenants, and the loss of trust of tenants with their landlord; while on the other hand, we have a right which the plaintiffs, by their own testimony, admitted that they did not intend to exercise.

In both *Broadrick* and the *Letter Carriers* case, the Supreme Court held that the usual strict standards of first amendment scrutiny are relaxed where the restriction, as is found in the memorandum herein, applies evenhandedly to the expression of various opposing views.

> The restrictions so far imposed on federal employees are not aimed at particular parties, groups or points of view but apply equally to all partisan activities of the type described. They discriminate against no racial, ethnic or religious minorities. Nor do they seek to control political opinions or beliefs, or to interfere with or influence anyone's vote at the polls. Letter Carriers, 413 U.S. 564, 93 S.Ct. 2890,

37 L.Ed.2d 808. See also Broadrick, 413 U.S. 614, 93 S.Ct. 2917, 37 L.Ed. 2d 841.

In the case at bar, the second paragraph of the memorandum prohibits *all* Philadelphia Housing Authority employees from discussing Resident Advisory Board politics with tenants *either pro or con*. The restriction, therefore, applied evenhandedly to all employees and was not aimed at persons partisan to the Resident Advisory Board or their point of view. In fact, as Gilbert Stein testified, but for the memorandum, an overwhelming majority of Philadelphia Housing Authority employees would have campaigned against the Resident Advisory Board. It should also be noted that even the administrators of the Philadelphia Housing Authority, including its Executive Director, signed the memorandum. This is in direct contrast to the Hatch Act, which excludes high executives.

It may be argued by the plaintiffs that approximately 65 to 70 Philadelphia Housing Authority employees from the over 1300 employees of the Philadelphia Housing Authority may not have signed the memorandum. If this is so, it was not through the fault or lack of effort by Gilbert Stein or with his knowledge. His strict orders were that *all* employees sign the memorandum. Furthermore, there was no clear evidence that those persons did not, in fact, sign the memorandum. There was no evidence at all that they affirmatively refused, as did these plaintiffs, to sign it. In fact, there is no Philadelphia Housing Authority employee who refused to sign the memorandum that was not treated as were these plaintiffs.

In the *Letter Carriers* case, the Supreme Court rejected the contention that the government's legitimate interest extends only to prohibiting outright coercion or electioneering after it occurs:

[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they *appear* to the public to be avoiding it if confidence in the system of representative Government is not to be eroded to a disastrous extent. 413 U.S. 565, 93 S.Ct. 2890, 37 L.Ed.2d 809 (Emphasis supplied).

It may be urged that prohibitions against coercion are sufficient protection; but for many years the joint judgment of the Executive and Congress has been that to protect the rights of federal employees with respect to his job and his political acts and beliefs it is not enough merely to forbid one employee from attempting to influence or coerce another. 413 U.S. 566, 93 S.Ct. 2891, 37 L.Ed. 2d 809 (Emphasis supplied)

In accord with this view is Professor Emerson of Yale Law School, a well known civil libertarian. "Insofar as the political activity of an employee results in failure to perform his duties, or a conflict of interest, *or even an appearance of conflict*, his conduct is subject to control without abridgment of the First Amendment." Emerson's The System of Freedom of Expression, 592. (Emphasis supplied). It is hard to conceive of what would create a greater appearance of conflict than employees of the Philadelphia Housing Authority campaigning for or against the Resident Advisory Board. "To some extent," Professor Emerson continues, "these controls can be imposed by *advance rule* rather than merely by subsequent sanction." *Idem* (Emphasis supplied).

In the case at bar, as was testified to by Gilbert Stein, the Philadelphia Housing Authority tenants believed that the Resident Advisory Board and the Philadelphia Housing Authority were working hand in glove to defraud and take advantage of the tenants. The plebiscite in question was to restore tenants' confidence in the Philadelphia Housing Authority and to assure them that only persons of their choice would represent them. It was imperative to avoid even the appearance of interference, as well as actual interference. Non interference, and the appearance of non interference, was also necessary because of

the Resident Advisory Board's contention that the Philadelphia Housing Authority would use its position with the tenants to influence them to vote against the Resident Advisory Board.

Finally, it should be noted that the restrictions under the Hatch Act were upheld although they applied to millions of federal and state employees, and to any and all partisan causes and candidates, and for an indefinite length of time. The restriction which the plaintiffs herein attack applies only to one controversy, to one election campaign, to the employees of only one government agency, and to last only a matter of months.

This Court must conclude that if the restrictions imposed by the Hatch Act are constitutional, the much narrower restrictions imposed by "the memorandum" are also constitutional and lawful on their face.

The Hatch Act is a clear prior restraint on free speech in that it affects an employee's freedom of expression starting at the moment they enter government service, well in advance of any actual speech or misconduct. The Hatch Act, according to Professor Emerson, "operates as a broad *prior* control, cutting off beforehand political conduct of almost every description except voting, without regard to the specific impact in any particular case." Emerson, The System of Freedom of Expression, 583 (1970) (Emphasis Supplied). Therefore, just as the Hatch Act has been held to be constitutional, i.e. not violative of the First Amendment right of freedom of speech, so must this memorandum be held to be constitutional and non violative of the First Amendment.

Although the plaintiffs admit that the Philadelphia Housing Authority has the right to proscribe the conduct to which the memorandum was aimed, they assert that "[t]here can be no prior restraint on the individuals right to speak. . . [T]here has, to date, been no decision of any Court which has ultimately affirmed a prior restraint on free speech." (Plaintiffs' memorandum of law in support of their motion for summary judgment, p. 3).

This is not the case. "It has never been held that liberty of speech is absolute. Nor has it been suggested that all previous restraints on speech are invalid." Times Film Corporation v. Chicago, 365 U.S. 43, 47, 81 S.Ct. 391, 393, 5 L.Ed.2d 403 (1961). "The phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." Kingsley Books v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1328, 1 L.Ed. 2d 1469 (1957).

There are many leading decisions of the United States Supreme Court which have upheld prior restraints on freedom of speech. See for example Times Film Corporation v. Chicago, supra, where the Supreme Court upheld a system of censorship of motion pictures; Kingsley Books v. Brown, supra, where the Supreme Court upheld a system of injunctions against the sale and distribution of allegedly obscene books; Giboney v. Empire Storage and Ice Company, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949) and Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1949) where the Court upheld injunctions against peaceful picketing; Ferris v. Frohman, 223 U.S. 424, 32 S.Ct. 263, 56 L.Ed. 492 (1912), where the Court upheld an injunction against the performance of a play which violated the common law of copyright; and International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) where the Supreme Court upheld an injunction against the distribution of pirated news releases, even though this pirating was not prohibited by the copyright laws. The Supreme Court has also upheld injunctions against speech in Gompers v. Buck's Stove & Range Company, 221 U.S. 418, 31 S.Ct. 492, 55 L. Ed. 797 (1911) and in E. I. DuPont d'Nemours Powder Company v. Masland, 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917), and an injunction against the distribution of confidential price quotations in Board of Trade v. Christie

Grain & Stock Company, 198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031 (1905).

The prior restraint cases cited by the plaintiffs deal with the narrow problem of governmental restrictions on the means of *mass communication*. For example, the plaintiffs rely heavily on New York Times, Inc. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). That case did not condemn all prior restraints, nor even all governmental injunctions against newspapers. The Supreme Court in a short per curiam opinion simply concluded that the government had not demonstrated that it was entitled to an injunction in that particular case. In their separate opinions, only two of the nine Justices, i.e. Justice Black and Justice Douglas, even took the position that injunctions against newspapers, let alone all prior restraints, were prohibited. Justices Stewart, White, and Marshall denied the injunction on the facts of that case and relied heavily on the deliberate refusal of Congress to authorize injunctions against the publication of classified information. 403 U.S. at 730, 91 S.Ct. at 2149 (Stewart, J. concurring), *id.* at 731–732, 91 S.Ct. at 2150–2151 (White, J. concurring), *id.* at 741–743, 91 S.Ct. at 2155–2156 (Marshall, J. concurring). Three of the Justices, of course, would have allowed the injunction even in the New York Times case. Not one of the Justices stated that all prior restraints on any form of expression were invalid.

The doctrine of freedom from prior restraint, in its original formulation by Blackstone, applied only to the press. The doctrine was in a sense a call to freedom of the press in the wake of a statutory printers' monopoly in sixteenth century England which required that any work be licensed before it could be printed. Emerson, "The Doctrine of Prior Restraint," 20 Law and Contemporary Problems, 648 (1955) at 650–51.

"Apart from occasional routine statements of principle the Court did not invoke the doctrine until, in 1931, it decided the case of Near v. Minnesota," 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 Emerson, "The Doctrine of Prior Restraint", at 652. This leading case on the doctrine of prior restraint relied on the role of the press in exposing the malfeasance of public officials. 283 U. S. at 718–719, 51 S.Ct. 625.

In the *New York Times* case, *supra*, the Supreme Court was careful to note that it was dealing with the unique role of the press. Thus Justice Black stated: "In my view it is unfortunate that some of my Brethren are apparently willing to hold that the publication of *news* may sometimes be enjoined." 403 U.S. at 715, 91 S.Ct. at 2142. (Emphasis supplied). Justice Douglas stated: The First Amendment "leaves, in my view, no room for governmental restraint on the *press*." 403 U.S. at 720, 91 S.Ct. at 2144. (Emphasis supplied). Justice Brennan stated: "But the First Amendment tolerates absolutely no prior judicial restraints of the *press* predicated upon surmise or conjecture that untoward consequences may result." 403 U.S. at 725–726, 91 S.Ct. at 2147. (Emphasis supplied). Justice Stewart stated: "For without an informed and free *press* there cannot be an enlightened people." 403 U.S. at 728, 91 S.Ct. at 2148. (Emphasis supplied). Justice White stated: "I concur in today's judgments, but only because of the concededly extraordinary protection against prior restraints enjoyed by the *press* under our constitutional system". 403 U.S. at 730–731, 91 S.Ct. at 2150. (Emphasis supplied). Justice Marshall believed that the ultimate issue was "whether this Court or the Congress has the power to make law," and discussed that problem rather than the First Amendment. 403 U.S. at 741, 91 S.Ct. at 2155. The three dissenting Justices, of course, would have allowed an injunction even where the press is concerned.

The four other cases relied upon by the plaintiffs likewise deal with mass communications: Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971), (public distribution of leaflets); Carroll v. President and Commissioners of Prin-

cess Anne, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968), (an ex parte injunction against a *public* rally); Bantam Books v. Sullivan, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963), (censorship of books); and Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), (a newspaper). None of these cases involve public employees whose right to freedom of expression, the Supreme Court has repeatedly held, may be restricted to a greater extent than that of independent citizens.

Lest any impression remain that *New York Times, supra,* outlawed all prior restraints even on mass communications, the United States Supreme Court on June 21st of this year in Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), upheld an ex parte injunction against an obscene film. In this decision, the Court greatly expanded the definition of obscenity and the amount of material constitutionally subject to prior restraint.

Therefore, the plaintiffs' position that all prior restraints are unconstitutional is untenable.

■ The Philadelphia Housing Authority, like all governmental agencies, has a continuing interest in maintaining the *appearance,* as well as the fact, of impartiality, and in preventing its employees from engaging in politicking rather than doing their jobs. In view of the Supreme Court's recent decisions in *Broadrick, supra,* and *Letter Carriers, supra,* this interest alone is sufficient to justify substantial restrictions on the employees' freedom of expression.

In the case at bar, there are even more compelling reasons for maintaining the *appearance,* as well as the fact of "non-interference" than in the Hatch Act cases. Here, as Gilbert Stein testified, the tenants were long under the impression that the Philadelphia Housing Authority and the Resident Advisory Board had been conspiring to defraud and take advantage of them (N.T. pp. 124–126). If that impression were to be rectified, and confidence restored in the Philadelphia Housing Authority,

and in a tenant's right to choose freely whom he wanted to represent him, it was imperative that the election appear, as well as in fact be, free of influence by the Philadelphia Housing Authority and by Philadelphia Housing Authority employees.

Moreover, Stein issued the memorandum not only because he was convinced that the interest of the Philadelphia Housing Authority required that its employees not interfere with the election, but also because he was convinced that compliance with the memorandum was necessary to protect the Philadelphia Housing Authority's tenants' rights of freedom of speech and due process. Many tenants of the Philadelphia Housing Authority are dependent upon the Philadeplphia Housing Authority for their social welfare services. These services are administered by Philadelphia Housing Authority employees. To have permitted those employees to campaign, either for or against the Resident Advisory Board, might have caused the tenant to believe that if he did not vote the way his social worker directed him to vote, his welfare services would be terminated, thereby creating an impermissible "chilling effect" upon the tenant's constitutional rights. (N.T. pp. 131–132).

For similar reasons, Congress has imposed, and the Supreme Court has repeatedly upheld, broad restraints on the rights of employers to politic in union representation elections under the National Labor Relations Act. Employers and their agents are even prohibited from making some statements which are, on their face, merely disinterested expressions of opinion: 29 U.S.C.A. § 158(b)(1). See NLRB v. Gissel Packing Co., 395 U.S. 575, 617–618, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

■ Furthermore, it had been the Resident Advisory Board's contention that the Philadelphia Housing Authority would attempt to interfere with the election. As a result, the Philadelphia Housing Authority and the Resident Advisory Board entered into a stipulation,

approved by Judge Weiner, that the Philadelphia Housing Authority would not interfere with the election (N.T. pp. 134–137). The Philadelphia Housing Authority could only adhere to its commitment to the Court and to the Resident Advisory Board if its employees agreed not to interfere with the election.

In "the RAB case" Judge Weiner entered an injunction preventing the Philadelphia Housing Authority or its employees from expressing any opinion to the tenants or others regarding the election involving the Resident Advisory Board. This injunction is of great significance to the instant case. It not only establishes that a Judge of this Court believed there may be a valid restraint on speech, and indeed Judge Weiner's Order is a restraint on speech, but also, that Order establishes that the Philadelphia Housing Authority had a significant, compelling, and valid governmental interest in preventing its employees from interfering with the election or discussing Resident Advisory Board politics, pro or con. In this connection, it should be noted and emphasized that this Court has held that the memorandum to the Philadelphia Housing Authority employees was neither vague nor overbroad.

On page 3 of their Reply Brief, the plaintiffs concede that "a prior restraint is not *necessarily* unconstitutional under *all* circumstances." (Emphasis in the original). With this basic and fundamental proposition established, the question becomes whether a significant and compelling governmental interest is sufficient to impose and justify a restraint on speech.

The plaintiffs argue that no matter what the reason, even if it is to prevent certain violence, intimidation, or severe encroachment on the constitutional rights of others, there can be no prior restraint on speech except when the nation is at war. In support of this extreme view, they cite Times Film Corp. v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) and Freedman v.

Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).

In *Times Film*, the Supreme Court held that prior restraints are constitutionally permissible and that the dissemination of a movie could be restrained prior to even its first showing. See 365 U.S. at 46, 81 S.Ct. 391. The Court held that the plaintiff movie exhibitor could not unleash a general and broadside attack on a system of prior restraints by withholding his film from inspection by state administrative agencies (365 U.S. at 50, 81 S.Ct. 391), but rather he had to submit the film to state inspection, and then bring suit only if his film was wrongly rejected.

The plaintiffs herein have testified that they did not refuse to sign the memorandum in question because they intended to interfere in the Resident Advisory Board election, but rather because they did not know what behavior it proscribed. This Court held that the memorandum was not vague or overbroad. The plaintiffs, therefore, knew, or should have known, what restraints it imposed on their behavior.

If plaintiffs' testimony is true, and they did not intend to interfere with the election, their only purpose in not signing the memorandum must have been to make a "broadside attack" on the constitutionality of the restraint. Such an attack was held to be impermissible under *Times Film*.

In Freedman v. Maryland, the Supreme Court was careful not to disturb its holding in *Times Film Corp.* See 380 U.S. at 53–54, 85 S.Ct. 734. The Court in *Freedman* held that even a broad statewide system of censorship of *mass communication* should not be automatically struck down without careful inquiry into its purpose and specific operations.

Although the plaintiffs admit that a prior restraint may be valid, they assert that the cases cited by the defendants do not deal with prior restraints on *speech*. The plaintiffs cite as examples Kingsley Books v. Brown, 354 U.S. 436, 77 S.Ct.

1325, 1 L.Ed.2d 1469 (1957); Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949); and Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973).

In *Kingsley Books* the Supreme Court specifically used the term "prior restraint" and stated:

The judicial angle of vision in testing the validity of a statute like [the New York obscenity statute] is "the operation and effect of the statute in substance." [Near v. Minnesota, 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L. Ed. 1357.] The phrase "prior restraint" is not a self-wielding sword. Nor can it serve as a talismanic test. The duty of closer analysis and critical judgment in applying the thought behind the phrase has thus been authoritatively put by one who brings weighty learning to his support of constitutionally protected liberties: "What is needed," writes Professor Paul A. Freund, "is a pragmatic assessment of its operation in the particular circumstances. The generalization that prior restraint is particularly obnoxious in civil liberties cases must yield to more particularistic analysis." The Supreme Court and Civil Liberties, 4 Vand.L.Rev. 533, 539 [354 U.S. 436, 441–442, 77 S.Ct. 1325, 1328].

■ In *Giboney* the Supreme Court upheld an injunction preventing the dissemination of truthful information by means of peaceful picketing. See 336 U.S. at 497–498, 69 S.Ct. 684. In Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1949) the Court upheld an injunction against peaceful picketing which did not violate any specific statute, though it violated public policy. Intimidation of voters by government employees, similar to speech inducing or promoting a restraint on trade, has never been considered constitutionally protected speech and has always been contrary to public policy. Recently, the Supreme Court has indi-

cated that a wide range of political conduct by government employees, on or off duty, is not "protected speech," but is "manifestly subject to state regulation." Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830, 842 (1973) Accord, United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

The *Giboney* holding was not limited to picketing, but to any course of conduct which has both speech and nonspeech components. 336 U.S. at 502. The trial court in *Giboney* did not simply enjoin the carrying of specific signs or the mouthing of specific epithets which were placed before the Court, but banned picketing entirely. 336 U.S. at 494, 69 S.Ct. 684.

In *Paris Adult Theatre I*, the trial court first imposed an ex parte injunction against taking the allegedly obscene film out of the jurisdiction (413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446) thus restraining the distributors' freedom to disseminate it before any adversary hearing. In that case, as well as its companion case, Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), the Supreme Court greatly broadened and expanded the category of obscenity and opened a wider range of speech and expression to state sanction. The Court in *Paris Adult Theatre I* reaffirmed its earlier line of cases in holding that this sanction can be applied by means of prior restraint as well as by subsequent sanction. 413 U.S. 49, 55, 93 S.Ct. 2628, 2634, 37 L.Ed.2d 446, 455–456.

The plaintiffs have made no response to the defendants' argument that the doctrine of prior restraint was developed and applied to prevent governmental interference with the means of public mass communication, a consideration not present in the instant case.

Nor do the plaintiffs deal with or mention the crucial issues raised in the defendants' citation of the Letter Car-

riers' case, 413 U.S. 548, 564, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796, 808:

> The government has an interest in regulating the conduct and "the speech of its employees that differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." [Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).] Although Congress is free to strike a different balance than it has, if it so chooses, we think the balance it has so far struck is sustainable by the obviously important interests sought to be served by the limitations on partisan political activities now contained in the Hatch Act.

The Court went on to say that:

> Neither the right to associate nor the right to participate in political activities is absolute in any event. See, e.g., Rosario v. Rockefeller, 410 U.S. 752 [93 S.Ct. 1245, 36 L.Ed.2d 1] (1973); Dunn v. Blumstein, 405 U.S. 330, 336 [92 S.Ct. 995, 999, 31 L.Ed. 2d 274] (1972); Bullock v. Carter, 405 U.S. 134, 140–141 [92 S.Ct. 849, 854–855, 31 L.Ed.2d 92] (1972); Jenness v. Fortson, 403 U.S. 431 [91 S.Ct. 1970, 29 L.Ed.2d 554] (1971); Williams v. Rhodes, 393 U.S. 23, 30–31, [89 S.Ct. 5, 10–11, 21 L.Ed.2d 24] (1968). (413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed. 796, 810 (1973)).

■ The above quoted excerpts from the *Letter Carriers* case makes clear that when a restraint serves a significant governmental interest, it is valid and must be enforced. As the Supreme Court noted recently in the same case, the government's legitimate interests and powers as an employer extend beyond prohibiting outright coercion or electioneering *after* it has occurred:

> [I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they *appear* to the public to be avoiding it if confidence in the system of representative Government is not to be eroded to a disastrous extent.

> It may be urged that prohibitions against coercion are sufficient protection; but for many years the joint judgment of the Executive and Congress has been that to protect the rights of federal employees with respect to his job and his political acts and beliefs it is not enough merely to forbid one employee from *attempting* to influence or coerce another. (413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796, 809, Emphasis supplied)

Although the plaintiffs impliedly admit that the Hatch Act is a prior restraint on speech, they argue that the cases upholding it do not apply to the instant case. With this, we do not agree. Prospective governmental employees have a choice: They can either sign the Hatch Act pledge and agree not to participate in political activities in partial consideration for their employment, or they can refuse to sign the Hatch Act pledge and remain free to be politically active, but by so doing lose their opportunity to become government employees. They cannot, in any event, work for the government on their own terms. See the *Letter Carriers* case and Adler v. Board of Education of the City of New York, 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517 (1951):

> It is clear that [government employees and government job applicants] have the right under our law to assemble, speak, think and believe as they will. Communications Ass'n. v. Douds, 339 U.S. 382, [70 S.Ct. 674, 94 L.Ed. 925]. It is equally clear that they have no right to work for the State in the school system on their own terms. United Public Workers v. Mitchell, 330 U.S. 75, [67 S.Ct. 556, 91 L.Ed.

754]. They may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere.

Each of the plaintiffs in the instant case signed the Hatch Act pledge when he or she became an employee of the Philadelphia Housing Authority, and each agreed not to participate actively in political campaigns. At that time, each gave up his or her right to work for partisan causes and chose, instead, to work for the Philadelphia Housing Authority. In the instant case, they were again asked to make the same choice, i.e. to work for the Philadelphia Housing Authority and not to interfere or campaign in the upcoming Resident Advisory Board election, or to "go elsewhere." They made their choice when they refused to sign the pledge. It was this act that caused their termination.

The plaintiffs now contend that although the purpose and scope of the restraint imposed in the instant case are constitutional, the manner in which it was imposed, i.e., by asking the plaintiffs to sign the memorandum as a condition precedent to future employment, makes it an impermissible prior restraint. But, insofar as the Philadelphia Housing Authority employees are concerned, the method of enforcement of the Hatch Act, and the restraint which was imposed in this case, are not merely similar but *identical*. As a condition precedent to employment, a prospective employee must sign a pledge which embodies the restrictions imposed by the Hatch Act, and concludes "I have read the above and understand that as an employee of the Philadelphia Housing Authority I must abide by these restrictions on political activity." The plaintiffs herein signed that pledge without protest.

The restraint imposed in this case could not be ruled invalid without also invalidating the restraints which the Hatch Act imposes on Federal employees. Both were imposed in exactly the same manner and for exactly the same purpose.

The plaintiffs have argued that (1) by the time they were fired, there was no election scheduled, and (2) the defendants Gilbert Stein and the Philadelphia Housing Authority violated their own memorandum by "blasting" the Resident Advisory Board in "The Good Neighbor" issued on March 2, 1973. It is clear from the record that the Resident Advisory Board election, which had been scheduled to take place at the time the plaintiffs were terminated, had been postponed, not cancelled (N.T. p. 147).

With regard to the plaintiffs' second argument, the record shows that the defendant Stein had left the employ of the Philadelphia Housing Authority before March 2, 1973, and had, in every way, adhered to the proscriptions in the memorandum which he had issued and signed (N.T. pp. 138, 162).

As noted in the defendants' opening brief, the purpose of the memorandum and the Philadelphia Housing Authority's interest served by it were the preservation of the constitutional rights of the tenants of the Philadelphia Housing Authority to freedom of expression and freedom of association, the prevention of violence of the type which had occurred in the past, the maintenance of impartiality and the appearance of impartiality, which the Philadelphia Housing Authority is legally obliged to maintain, and the prevention of a dissipation of efforts which would occur if Philadelphia Housing Authority employees were allowed to campaign when they should be working. The fear of interference by Philadelphia Housing Authority employees was not groundless. This fear was pressed and brought to light in the suit before Judge Weiner initiated by the Resident Advisory Board. As a result of this fear, on both the part of the Philadelphia Housing Authority and the Resident Advisory Board, the Philadelphia Housing Authority and the Resident Advisory Board entered into a stipulation, and Judge Weiner issued an Or-

der on May 9, 1973, which largely repeated the instruction which Gilbert Stein earlier gave the plaintiffs in his memorandum. If we held that memorandum an unconstitutional restraint on speech, we would, in effect, be forced to conclude that the Order of Judge Weiner was unconstitutional and unlawful. That obviously was not the case. Judge Weiner recognized the need for impartiality and noninterference with the election by the Philadelphia Housing Authority and its employees, and he therefore issued his Order of May 9, 1973.

The plaintiffs have testified that they did not intend to campaign or interfere with the election. Yet they refused to sign the memorandum which this Court has already held to be clear on its face, and neither vague nor overbroad. Thus, the plaintiffs' purely hypothetical and academic interest in launching a broadside attack on what they believe to be an unconstitutional memorandum must be balanced against the interests set forth above which were clear and obvious to the Philadelphia Housing Authority, the Housing Authority's officers, the Resident Advisory Board (with which the plaintiffs have been closely associated), and Judge Weiner, and which were interests of the type which the United States Supreme Court has repeatedly held to be valid and compelling.

## CONCLUSIONS OF LAW

1. Jurisdiction over the Philadelphia Housing Authority is proper under 28 U.S.C.A. § 1343(3) and (4), 42 U.S.C.A. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction over the individually named defendants is proper under 28 U.S.C.A. § 1343(3) and (4), 42 U.S.C.A. § 1983, and the First and Fourteenth Amendments to the United States Constitution.

3. This is an appropriate case for declaratory and injunctive relief, as well as for the award of back pay.

4. The defendants in this action are state officers, and the Philadelphia Housing Authority is a public agency, all acting under color of state law and involving "state action" within the purview of 42 U.S.C.A. § 1983 and the Fourteenth Amendment to the United States Constitution.

5. The plaintiffs in this action refused to sign a document, proffered them by the defendants, by which they would agree in advance to limit their right to speak, a right guaranteed the plaintiffs against unreasonable invasion by the state under the First and Fourteenth Amendments to the United States Constitution.

6. The plaintiffs were employees of a public agency, the Philadelphia Housing Authority.

7. Since the plaintiffs engaged in no actual conduct that in any way adversely affected any interest of the Philadelphia Housing Authority, their dismissal was solely because they would not agree, in advance, to limit their speech.

8. The Philadelphia Housing Authority's discharge of the plaintiffs represented a reasonable exercise by the Housing Authority of its constitutionally permitted authority as a public employer.

9. The discharge of the plaintiffs did not violate § 1983 of Title 42 of the United States Code, nor did the discharge of the plaintiffs violate their rights as secured to them by the First and Fourteenth Amendments to the United States Constitution.

10. The defendants acted to preserve the vital governmental interest of efficiency, impartiality, and noninterference in an upcoming and critical tenants' representative election.