**Brenda ALDERMAN et al.,**
**Appellants,**

v.

**The PHILADELPHIA HOUSING AUTHORITY et al., Appellees.**

**No. 73–1924.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 14, 1974.

Decided April 16, 1974.

tain political activity by such employees. We hold that, in the circumstances presented here, the restraint constituted an impermissible infringement of the employees' rights of free expression.

I

An understanding of the case requires a rather extensive exposition of the factual backdrop.

The appellants, plaintiffs in the district court, are four former employees of the Philadelphia Housing Authority ("PHA"). They were summarily discharged from their jobs for refusing to sign a "Memorandum" directing that they refrain from making *any* statements regarding an election among PHA tenants. The PHA is a public agency created by state statute[1] for the purpose, *inter alia,* of providing "low-income" housing. It administers and maintains upwards of 20,000 housing units, where more than 100,000 persons reside.[2] Appellee Gilbert Stein was the Executive Director of the PHA, serving in that capacity from August of 1972, until February of 1973.

The Resident Advisory Board, Inc. ("RAB") purports to be the formal representative of public housing tenants in Philadelphia. At the time Mr. Stein became Director of PHA, there existed a controversy between PHA and RAB over whether RAB's representation of tenants should continue and, indeed, whether RAB was in fact representative of the interests of Philadelphia public housing residents.

In October, 1972, PHA decided to hold a "plebiscite" or referendum to determine whether public housing tenants, in their dealings with the PHA, desired representation by RAB. The vote was initially scheduled for December, 1972. In November, 1972, prior to the date set for the election, Mr. Stein caused to be issued to all PHA employees the following "Memorandum:"

Robert J. Reinstein, Philadelphia, Pa., for appellant Deming.

Harold I. Goodman, Bruce E. Endy, Community Legal Services, Inc., Philadelphia, Pa., for appellants Alderman, Smith and Williams.

Harold Cramer, Philadelphia, Pa., for appellees.

Before VAN DUSEN and ADAMS, Circuit Judges, and NEALON, District Judge.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This case presents a novel question of First Amendment jurisprudence; namely, whether the imposition of a "prior restraint" by a public agency upon the speech of its employees was justified by the agency's interest in curtailing cer-

---

1. Housing Authorities Law, Act of May 28, 1937, 35 P.S. § 1541 et seq.

2. *See* Brief of Appellees, at 2.

"No PHA employee shall engage in any form of interference during the upcoming tenant plebiscite to determine whether residents of the PHA-managed properties want to be represented by the RAB Corporation

. . . . . ..

It is the policy of this authority to encourage all tenants to exercise their right of choice . . . but there should be no attempt by PHA employees to discuss RAB politics with tenants, either pro or con.

Any employee who engages in such activity will be subject to immediate dismissal.

/s/ Gilbert Stein

. . . . . .

I have read the above and understand that as an employee of the Philadelphia Housing Authority, I must abide by this restriction.

————————————— [3]

Employee's Signature

Mr. Stein was apparently of the opinion that, if permitted to do so, many PHA employees would campaign actively against the RAB, that violent confrontations might result, and that PHA tenants might be influenced by PHA employees to vote against the RAB.[4] His reaction was to issue the memorandum set forth above.

Subsequent to the issuance of the Stein memorandum, but before the plebiscite scheduled for December of 1972 could be held, RAB brought a suit in the district court to enjoin the election.[5] As a result, the vote was postponed until May of 1973. On December 11, 1972, PHA and RAB entered into a stipulation

in that lawsuit, approved by the district court, which provided in part that:

"The Philadelphia Housing Authority agrees that it will not take a position on the election provided for above. This shall not prevent PHA from answering any criticisms of its personnel or policies."[6]

All but 65 of the PHA's employees agreed to, and did, sign the Stein memorandum.[7] Four of the non-signers, the appellants in this case, were discharged for their failure to sign. Some explanation of the circumstances surrounding the refusal to sign by each of the four appellants may be helpful here.

Appellant Deming, a social worker, stated in a letter to the PHA that "I find it impossible to sign the attached memo because I view it to be a waiver of my First Amendment rights of free speech . . . ."[8] She also indicated that some discussion of the upcoming PHA-RAB election with her clients might prove to be a necessary aspect of her professional duties, and that, in any event, she wished to retain the right to express her views during off-duty hours. At least by her own understanding, she did have some "responsibility of not expressing my ideas while at the same time representing myself as an employee of PHA." Deming was dismissed from PHA employment on December 19, 1972, for the express reason that she had refused to sign the Stein memorandum.[9]

Appellant Smith, in a letter to PHA dated December 29, 1972, indicated an initial willingness to sign the Stein memorandum, provided Smith received assurance that the memorandum reflect-

3. Finding of Fact No. 18, district court opinion of September 24, 1973, 365 F.Supp. 350.

4. *See* Brief of Appellees, at 5.

5. Resident Advisory Bd. v. Philadelphia Housing Authority, C.A. No. 72–2399 (E.D. Pa.). No aspect of the PHA–RAB lawsuit is before us in this appeal, nor are any of the appellants here involved in that suit.

6. Finding of Fact No. 21, district court opinion of September 24, 1973, 365 F.Supp. 350.

7. PHA claims that its records do not show affirmatively that the other 61 employees

actually failed to sign, but that there is no indication that they did sign. This is ascribed, to some extent, to their absence from work at the time the memorandum was circulated. *See* Brief of Appellees, at 7.

8. Brief of Appellants, at 9; App. 11.

9. Direct testimony of Gilbert Stein, App. 282; Finding of Fact No. 28, district court opinion of September 24, 1973, 365 F.Supp. 350.

ed only an attempt by PHA to comply with the Stipulation that had been entered on December 11, 1972 in the RAB-PHA lawsuit.[10] Smith never received a response to his letter. For his failure to sign, he was dismissed by PHA on December 29.

Appellant Alderman attempted, unsuccessfully, to discuss the memorandum with Mr. Stein. On January 5, 1973, she was dismissed by PHA for her failure to sign. Appellant Williams was likewise dismissed, on December 29, for failure to sign the memorandum. Both Ms. Alderman and Ms. Williams were public housing tenants while they were employed by PHA. All four appellants, upon beginning to work for PHA, *had* signed a Hatch Act pledge, prohibiting them from active partisan participation in political campaigns.

Although they refused to sign the memorandum, it is uncontested that none of the appellants ever interfered in the RAB election, and that none of them ever discussed RAB politics with public housing tenants prior to their dismissal.[11]

As previously noted, Mr. Stein ceased serving as Executive Director of PHA on February 20, 1973. However, on March 2, 1973, the PHA house organ "The Good Neighbor" published a "report" by Mr. Stein that commented extensively on PHA-RAB relations and on the upcoming plebiscite.[12] On May 9, 1973, the district court in the PHA-RAB litigation, issued an order enjoining PHA from, inter alia, "making known" its position on the upcoming plebiscite.

In April of 1973, Alderman, Williams, Smith and Deming brought suit in the district court, under 42 U.S.C. § 1983, against Mr. Stein and PHA, contending that the appellants' discharges from employment trenched on certain of their civil rights.[13] The complaint was framed in three counts: Count I alleged that the memorandum as implemented by the discharges amounted to an unconstitutional prior restraint on speech, Count II sought to have the Stein memorandum declared unconstitutionally "vague" or "overbroad," and Count III challenged the dismissals on grounds of procedural due process. The appellants sought declaratory and mandatory injunctive relief—that is to say, reinstatement with back pay, interest, and accrued seniority.[14]

The district court, by two separate orders, ruled against the discharged employees on all three counts of the complaint. On May 15, 1973, the district court granted appellees' motion to dismiss Counts II and III of the complaint. On September 24, 1973, that court, after a hearing, entered an order granting actions judgment to appellees on Count I. Both are contested on this appeal.

We reverse the judgment of the district court, and adjudge the appellants entitled to relief based on their prior restraint argument. The justification proffered by PHA and Mr. Stein for the attempt, by way of their memorandum and the appellants' discharges, to throttle *all* discussion by PHA employees of the RAB referendum, is, stated broadly, that the PHA had a legitimate and compelling interest in preserving intact the image of PHA's impartiality. Important as this interest may have been, we conclude that it did not outbalance the weighty values sheltered by the First Amendment.

## II

Freedom of speech and expression occupies an exalted niche in the empyrean of personal liberties guaranteed by the Constitution.[15] This special position

---

10. See Note 6, *supra,* and accompanying text.

11. Finding of Fact No. 26, District Court Opinion of September 24, 1973, 365 F.Supp. 350.

12. The appellants contend that Mr. Stein's report shows, inter alia, that there was not a compelling interest in silencing *all* discussion regarding the election.

13. Jurisdiction was based upon 28 U.S.C. §§ 1343, 2201, and 2202.

14. The complaint also sought a declaration and injunction to protect appellants' procedural rights in any disciplinary hearing after their reinstatement.

15. Without taking sides in the "preferred position" debate, *see* Kovacs v. Cooper, 336 U.S. 77, 88, 69 S.Ct. 448, 93 L.Ed. 513 (ma-

may be a function of democratic theory. The right is viewed as one of "those liberties of the individual which history has attested as the indispensable conditions of an open as against a closed society . . . ."[16] To an extent, the favored status proceeds from the dynamics of free speech itself, inasmuch as it benefits and protects not only the speaker but, *mutatis mutandis,* the receptor of the speech as well.[17] Whatever the explanation for the ascendancy of the First Amendment protection, courts have remained particularly sensitive to governmental regulation that tends to impinge on expressive freedom.

This heightened sensitivity is manifest in, among other things, judicial distaste for the "prior restraint." Simply put, a prior restraint is an official restriction imposed upon speech or other forms of expression in advance of actual publication.[18] The concept does not treat the question of what subsequent punitive sanctions, if any, may properly be imposed for engaging in speech.[19]

It is by now axiomatic that "[a]ny system of prior restraints of expression comes to [a court] bearing a heavy presumption against its constitutional validity."[20] A fuller understanding of the historical and theoretical underpinnings of this judicial attitude should help to clarify our decision in this case.

The use of a prior restraint as an implement of official control of expression can be traced back at least as far as a papal decree of 1501.[21] In England,

jority opinion of Reed, J.) 90–97, 69 S.Ct. 448 (concurring opinion of Frankfurter, J.) (1949), there can be little doubt that the Supreme Court has shown a special solicitude for the right to freedom of expression. Even Justice Frankfurter's objection to the phrase, "the preferred position of freedom of speech," was apparently not grounded in any belief that such freedom is in all respects coequal with other rights, but rather in the feeling that "preferred position" is only a "formula" that "makes for mechanical jurisprudence." *Id.* at 96, 69 S.Ct. 448. The Supreme Court's special concern for the First Amendment right is manifest in such decisions as Thomas v. Collins, 323 U.S. 516, 527 n. 12, 65 S.Ct. 315, 89 L.Ed. 430 (1945), and Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Professor Wechsler has suggested that the "preferred position" argument is "pernicious" insofar as it injects a mechanistic note into First Amendment decision-making. He states, however, that "[i]t has a virtue . . . insofar as it recognizes that some ordering of social values is essential; that all cannot be given equal weight if the Bill of Rights is to be maintained." Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv.L.Rev. 1, 25 (1959). *See also* Berns, Freedom, Virtue and the First Amendment 73–128 (1957).

16. Kovacs v. Cooper, *supra* at 95, 69 S.Ct. at 458 (concurring opinion of Frankfurter, J.).

17. "From the obverse side [the system of freedom of expression] includes the right to hear the views of others and to listen to their version of the facts. It encom-

passes the right to inquire and, to a degree, the right of access to information." Emerson, The System of Freedom of Expression 3 (Vintage ed. 1971).

The traditional sanctity of freedom of expression probably owes something, also, to a recognition of the central role played by literature in man's ascent from barbarism. Milton, in his *Areopagitica,* expressed it thusly: "Who kills a man kills a reasonable creature, God's image; but he who destroys a good book kills reason itself. . . . ."

18. Emerson, The Doctrine of Prior Restraint, 20 Law and Contemp. Problems, 648 (1955) (hereinafter "Emerson, Prior Restraint"); Emerson, The System of Freedom of Expression 504 (Vintage ed. 1971) (hereinafter "Emerson, Freedom of Expression"). *See also* Near v. Minnesota, 283 U.S. 697, 713–14 (1931); 4 Blackstone, Commentaries on the Laws of England 151–52.

19. Emerson, Freedom of Expression, at 504.

20. New York Times v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam); Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); Near v. Minnesota, 283 U.S. 697, 719–720, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 51 L.Ed. 879 (1907).

21. Pope Alexander VI in that year issued a bull prohibiting unlicensed printing. *See* Emerson, Prior Restraint at 650.

where printing franchises were controlled by the Crown, there developed a complex system of governmental restraints on publication, typified by the Licensing Acts.[22] The Licensing Act of 1662 was enacted with the clear intention of imposing a prior restraint on, and not merely a *post facto* punishment for, "seditious, treasonable and unlicensed books and pamphets [sic] . . . ."[23] No person was permitted to print any material without prior approval by the appropriate state functionary. The Act, as administered by the zealot licensor L'Estrange, "gagged the London Press then, as it has never been gagged before or since."[24]

In the latter part of the Seventeenth Century public sentiment mounted against the Act and it lapsed, never to be revived.[25] When the First Amendment was drafted and adopted in 1791, the repugnance felt toward the old English system of censorship remained undimmed. Indeed, some have maintained that the Amendment was aimed primarily at prior restraints, and was not intended to proscribe subsequent punishments for various sorts of expression.[26] In any event, public antipathy toward prior restraints was transmitted to our law through the First Amendment. Judicial treatment of prior restraints has, at least in this century, reflected these historical developments.

The landmark decision of Near v. Minnesota [27] signals the Supreme Court's first extended disquisition on the doctrine of prior restraint. There the so-called Minnesota Gag Law was challenged on First Amendment grounds. The law provided for suits by the state to enjoin publication or circulation of any periodical found to be "obscene, lewd and lascivious" or "malicious, scandalous and defamatory." Chief Justice Hughes first discussed the doctrine's genealogy. Then, after adding the *caveat* that "the protection even as to previous restraint is not absolutely unlimited," [28] the Chief Justice left little doubt that the First Amendment tolerates few, if any, prior restraints on speech and press:

> "The exceptional nature of its limitations places in a strong light the general conception that liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship.
>
>     \*    \*    \*    \*    \*    \*
>
> "The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint. . . .' [29]

There thus was embedded in modern constitutional jurisprudence the concept that any system of prior restraints comes to a court bearing a heavy presumption against its validity.[30]

---

22. *See generally* Holdsworth, History of English Law, Vol. 6, pp. 360–78.

23. *Id.* at 372.

24. *Id.* at 372–73. L'Estrange's zeal as a censor led him beyond a concern for the imposition of "gags" on the press, to a desire to "make sure of destroying the offenders utterly." *Id.* at 373 n. 1.

25. Emerson, Prior Restraint at 651. Emerson notes that, though the English system of statutory prior restraint was allowed to die, subsequent punishments for seditious libel and blasphemy were applied with increasing frequency and severity. *Id.*

26. *Id.* at 652. *Cf.* Justice Holmes' remark for the Court in Patterson v. Colorado, *su-*

*pra*, 205 U.S. at 462, 27 S.Ct. at 558: "the main purpose of such constitutional provisions is to prevent all such *previous restraints* upon publications. . . ."

27. 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

28. *Id.* at 716, 51 S.Ct. at 631. *See* Note 57, *infra.*

29. *Id.* at 716, 720, 51 S.Ct. at 631–632. In our judgment, there is no significant distinction, for First Amendment purposes, between liberty of "speech" and of "the press."

30. *See* text accompanying Note 18, *supra,* and cases cited therein.

The viability of this proposition remains unabated today.[31] Professor Emerson has cataloged the functional justifications for the disfavor in which prior restraints are held.[32] Particularly noteworthy is his observation that a system of prior restraint "subjects to government scrutiny and approval *all* expression in the area controlled—the innocent and borderline as well as the offensive. . . ."[33] In addition, whereas subsequent punishment does not prevent the dissemination of the words in question, a prior restraint, by its very nature, seeks absolutely to exclude the speech from "the market place of ideas."[34] These considerations, together with others, provide firm ground for judicial insistence that, before it may be deemed justified, the government must offer compelling proof that a prior restraint is essential to a vital government interest. In light of this standard, we shall proceed to analyze the justification offered by the appellees, and the district court's evaluation of it.

### III

The Stein memorandum was construed by the district court as prohibiting "all Philadelphia Housing Authority Employees from discussing Resident Advisory Board politics with tenants, either pro or con." Neither the PHA nor Mr. Stein dispute that, as so construed—and in light of the discharge of the appellants for their refusal to sign—the memorandum operated as an effective prior restraint, imposed by a governmental body, on the speech of the PHA employees.[35] Rather, Mr. Stein and PHA seek to justify the restraint by invocation of the "significant and vital interest" of the PHA in preserving the plebiscite free of "interference" by PHA employees, in "prevent[ing] violent confrontations," and in "protect[ing] the tenants' rights of . . . freedom of choice in representation with regard to election."[36]

The district court concluded that the Stein memorandum, and the mechanism for its implementation, was necessary to accomplish the PHA's stated goals, and that the resulting prior restraint was justifiable under the Supreme Court's recent "Hatch Act" decisions.[37] It stated:

"The Philadelphia Housing Authority, like all governmental agencies, has a continuing interest in maintaining the appearance, as well as the fact, of impartiality, and in preventing its employees from engaging in politicking rather than doing their jobs. In view of the Supreme Court's recent decisions in Broadrick . . . and Letter Carriers . . . this interest alone is sufficient to justify substantial restrictions on the employees' freedom of expression."[38]

In our judgment, neither *Broadrick* nor *Letter Carriers* (the "Hatch Act" cases) nor any other case warrants the interdiction, embodied in the terms and enforcement mechanism of the Stein memorandum, against any and *all* discussion by PHA employees of the RAB plebiscite. Accordingly, we think that

---

31. *See e. g.*, Doe v. McMillan, 412 U.S. 306, 344, 93 S.Ct. 2018, 36 L.Ed.2d 912 (Opinion of Rehnquist, J.) (1973); Albany Welfare Rights Org. v. Wyman, 493 F.2d 1319 (2d Cir., 1974).

32. Emerson, Prior Restraint, at 656–60.

33. *Id.* at 656.

34. *Id.* at 657.

35. Nor can we fail to note that, inasmuch as the appellants *had* signed a Hatch Act pledge not to engage in "partisan political activity," a fact of which Mr. Stein was aware (app. 255, 357–8), his memorandum

was apparently aimed at prohibiting something more than such activity.

36. Brief of Appellees at 10. *See also* Finding of Fact No. 19, district court opinion of September 24, 1973, 365 F.Supp. 350.

37. United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

38. Opinion of District Court of September 24, 1973, 365 F.Supp. 350.

the "heavy burden" cast by the prior restraint cases upon PHA and Stein has not been met, and that the appellants' discharges violated their First Amendment and Fourteenth Amendment rights. Close analysis of the "Hatch Act" cases should serve to explain and illuminate this conclusion.

## IV

It is important to make clear at this juncture what we are *not* deciding. We are not deciding whether, under any set of circumstances, some sort of prior restraint on political activity by PHA employees might be justified, nor whether the "Hatch Act" cases can have any application in the context of a more-or-less *ad hoc* administrative measure, such as the Stein memorandum. Rather, the question before use is a less heroic one, namely, whether the prior restraint that absolutely forbade all "discussion" of the RAB plebiscite was justified by the PHA's interest in preventing political "interference" in the referendum. *Letter Carriers* and *Broadrick,* while less than pellucid in all of their implications,[39] make it clear that a restraint such as that in this case may not be countenanced by an analogy to the Hatch Act or to its state counterparts.

The Hatch Act prohibits federal employees from taking "an active part in political management or in political campaigns." In 1947, in United Public Workers v. Mitchell,[40] this provision was first upheld against First Amendment attack. The Supreme Court reasoned that Congress' conclusion "that an ac-

tively partisan governmental personnel threatens good administration"[41] justified the Act's restriction on political activity. The Court took care to note, however, that it was "only partisan political activity that is interdicted. . . . [Only] active participation in political management and political campaign [is proscribed]. Expressions, public or private, on public affairs, personalties and matters of public interest, not an objective of party action, are unrestricted . . . . ."[42]

In *Letter Carriers* the validity of the "active part" provision was reaffirmed, and upheld in the face of "vagueness" and "overbreadth" challenges.[43] The Court stated as a foundation for its holding, based on extensive legislative findings, that "the judgment of history" was that "federal service should depend upon meritorious performance, rather than political service, and that the political influence of federal employees on others and on the electoral process should be limited."[44] The interest of the government in protecting the civil service from undue political influence, manifested by a series of Congressional debates, was deemed to outweigh the employee's interest in the freedom to engage, unfettered, in partisan political activity.[45]

In *Broadrick,* the Supreme Court sustained state legislation that, in its basic aim and method of implementation, mirrored the Hatch Act.[46] Though the challenged state act left state employees with some uncertainty concerning the sort of activities they might permissibly

39. The Supreme Court's promulgation of a "substantial overbreadth" standard has generated considerable controversy. *See* Broadrick v. Oklahoma, 413 U.S. at 621–633, 93 S.Ct. 2908 (dissenting opinion of Brennan, J.) ; The Supreme Court, 1972 Term, 87 Harv.L.Rev. 1, 141–53 (1973).

40. 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

41. *Id.* at 97–98, 67 S.Ct. at 568.

42. *Id.* at 100, 67 S.Ct. at 570.

43. *See* Letter Carriers, *supra,* 413 U.S. at 568, 93 S.Ct. 2880. *See also* Note, The

First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970) ; Note, The Void-For-Vagueness Doctrine in The Supreme Court, 109 U.Pa.L.Rev. 67 (1960).

44. 413 U.S. at 557, 93 S.Ct. at 2886.

45. That the Court utilized some sort of "balancing" process was made quite explicit. *See* 413 U.S. at 564, 93 S.Ct. 2880. *Cf.* Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

46. *See* 413 U.S. at 602, 93 S.Ct. 2908.

engage in,[47] the Court again rejected a First Amendment vagueness and overbreadth assault on the state statute. And once again, the Court noted emphatically that the proscription of the Act ran only to "partisan political activity." [48]

The district court in this case perceived firm support in *Broadrick* and *Letter Carriers* for the constitutionality of the appellants' discharges. It stated, "just as the Hatch Act has been held to be constitutional, i.e., not violative of the First Amendment, so must this memorandum be held to be constitutional and non-violative of the First Amendment." We think, however, that *Broadrick* and *Letter Carriers*, properly viewed, carve out carefully circumscribed exceptions to the sweeping injunction of the First Amendment, exceptions allowing a legislature—Congress or state lawmakers—to inhibit only "partisan political activity" and not all political "discussion."

The vagueness attack mounted in *Letter Carriers* was predicated upon the assertion by the appellants there that, even were the basic goal of the Hatch Act to be deemed valid, the Act was "incapable of yielding any meaningful rules to govern present or future conduct."[49] The Supreme Court demurred to this contention, ruling that the Civil Service Commission Rules sufficiently "fleshed out" the statute.[50] Reference to those rules indicates that the Hatch Act is in no sense directed at the mere expression of political opinions, or at political discussion *simpliciter*. Indeed, Senator Hatch's explication of the rules makes clear that, under the Act, "[e]mployees may express their opinions on all subjects, but they may not make political

speeches."[51] Moreover, as the Supreme Court emphasized, section 7324(b) of the Act "privileges an employee to . . . express his opinion on political subjects and candidates . . ." [52] Thus, in upholding the Act's constitutionality, the Supreme Court did no more than sustain a curb upon political *activity* by governmental employees. To read *Letter Carriers*, as the district court apparently did, to authorize governmental restriction upon *all* forms of political *discussion* or *expression* would be to inflate the Supreme Court's edict far beyond its actual scope.

This conclusion—that neither *Letter Carriers* nor *Broadrick* signals approbation of the sort of blanket prohibition on employee speech embodied in the Stein memorandum—is buttressed by the repeated mention, in those cases, of the sort of employee activity that might legitimately be curtailed. The Hatch Act, the Supreme Court noted, prohibits "active participation in political management of political campaigns;" [53] Congress felt it "essential that federal employees not . . . take formal positions in political parties, nor undertake to play substantial roles in partisan political campaigns;" [54] so, too, may a state forbid any employee to "solicit, receive, or in any manner be concerned in soliciting or receiving any assessment . . . or contribution for any political organization. . . ." [55]

The excerpted instances set forth above make manifest that *Letter Carriers* and *Broadrick* herald only narrow, carefully drawn exceptions to the First Amendment's protections, not an authorization to restrain politically oriented speech and expression by governmental employees. In addition, the statutes

---

47. *See Broadrick, supra*, 413 U.S. at 622, 93 S.Ct. 2908 (discussing opinion of Justice Brennan). *See also* Note 38 *supra*, and accompanying text.

48. 413 U.S. at 602, 93 S.Ct. 2908.

49. 413 U.S. at 571, 93 S.Ct. 2893.

50. *Id.* at 572, 93 S.Ct. 2880.

51. *Id.* at 572 n. 18, 93 S.Ct. at 2894; *see also Id.* at 561, 93 S.Ct. at 2888.

52. *Id.* at 568, 93 S.Ct. at 2892.

53. *Id.* at 551, 93 S.Ct. at 2883.

54. *Id.* at 565, 93 S.Ct. at 2890.

55. *Broadrick, supra*, 413 U.S. at 606, 93 S. Ct. at 2912.

challenged in *Letter Carriers* and *Broadrick* represent a "considered legislative judgment," not the relatively spontaneous decision of a local government administrator.[56]

Thus, we think there is scant support in *Letter Carriers* or *Broadrick* for the district court's conclusion that the appellants' discharges were constitutionally valid. There being little warrant in those cases for *any* sort of inhibition of, or punishment for, politically oriented speech, it can hardly be said that the "heavy burden" imposed on the appellees in their attempt to justify a prior restraint has been adequately shouldered.

We need not decide, of course, whether a more narrowly drawn memorandum might have passed First Amendment muster—for example, a provision carefully limited so as to proscribe "partisan political activity" by PHA employees. Accordingly, our opinion in this case should not be interpreted as resting upon "overbreadth," "vagueness," or like doctrines.[57] Rather, our decision has been limited to the precise facts in question. An absolute prohibition on "discussion" of PHA–RAB politics has not, to us, seemed justified by the governmental interest asserted.[58]

This is not to suggest that a prior restraint on the speech of governmental employees may never be justified by any considerations.[59] It may well be too, that had the appellants been discharged by PHA subsequent to having uttered words that "interfered" with the PHA–RAB plebiscite, or cast doubt on PHA's impartiality,[60] resolution of the ensuing controversy might have been somewhat different. But, on the record here, there was no permissible basis for restraining the appellants in advance from any and all "discussion" of PHA or RAB politics.[61]

The "balancing" task imposed upon us in this case by the prior restraint doctrine is a somewhat sensitive one. We recognize, and sympathize with, the PHA's desire to preserve intact a public image of political impartiality. We ac-

56. We have found nothing in the record to show that there were any deliberations (extended or otherwise) before the issuance of the memorandum, or that the Administrator (here Mr. Stein) was empowered to issue such statements. *See* Note, The First Amendment Overbreadth Doctrine, 83 Harv. L.Rev. 844, 858 (1970).

57. An "overbreadth" analysis "involves scrutiny to determine whether a statute is too sweeping in its coverage." Note, The First Amendment Overbreadth Doctrine, 83 Harv. L.Rev. 844, 845 (1970). There clearly may be an area of overlap between overbreadth analysis and prior restraint analysis. For example, the "overbroad" aspects of a statute imposing a prior restraint might also be those aspects for which there was no "compelling" justification. The statute would thus be invalid *both* as being overbroad and as an unjustified prior restraint. While this mode of analysis might be useful, particularly in the case of statutes impinging First Amendment interests, we decline to pursue it here. Rather, we concentrate solely on the prior restraint aspects of this case. One purpose served by the overbreadth technique is to allow legislatures to redraft statutes. This purpose would not, obviously, be served in this case. *Id.* Also, the "dynamo of the overbreadth doctrine" is the concern for the "chilling effect" of subsequent punitive measures, a factor of only ancillary concern, if any, in a prior restraint case. *Id.* at 846. Finally, inasmuch as an overbreadth attack allows plaintiffs to assert *jus tertii*, it is of little utility here, since there are no other persons but these appellants who can claim harm from a failure to sign the Stein memorandum. *Id.* at 847.

58. Professor Emerson, writing before the decisions in *Letter Carriers* and *Broadrick*, expressed the view that the Hatch Act is "incompatible with First Amendment doctrine." Freedom of Expression 592.

59. Prior restraints, for example, may be justified when the nation "is at war." *See* Schenk v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

60. *See* text accompanying Note 11, *infra.*

61. We reject the "right-privilege" argument that, though PHA employees may have a "right" to speak, their employment by PHA is a "privilege," for the enjoyment of which they can be made to abandon the right. *See* McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892); Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439 (1968).

knowledge, too, that a governmental agency may have a significantly more weighty interest in regulating the speech of its employees than in regulating that of the populace at large.[62] There are, however, two factors in particular which have led us to hold in favor of the appellants. First, precious little in the case law supports the imposition of a restraint on *all* the speech of public employees, even concerning a particularized topic.[63] Second, we think that when a prior restraint is sought to be imposed, it should be as narrowly drawn as possible, consonant with the purpose in question. Thus, assuming *arguendo* the validity of PHA's desire to prevent only partisan political activity in connection with the RAB plebiscite, the failure of the Stein memorandum to reflect such specificity tends, in our judgment, to detract significantly from any attempt to shoulder the "heavy burden" imposed by First Amendment doctrine.

## V

First Amendment theory has appeared, to some, to be in a "chaotic state."[64] Perhaps that is the fate of any constitutional guarantee that stands as a keystone of our political, social and economic freedom. Nonetheless, two aspects of the First Amendment stand out in fairly sharp relief. One, the distaste for prior restraint, is firmly rooted in Anglo-American history, public sentiment, and legality. The other, a straitened channel of permissible restriction on the political activities of government employees, works a delicate balance between personal freedom of expression and governmental necessity. Nothing in this case has persuaded us that the sweeping prohibition embodied in the

Stein memorandum fell within the narrow compass of the "Hatch Act" cases. Still less are we convinced that the prior restraining effects of the discharges for failure to sign the memorandum were justified.

Accordingly, the judgment of the district court will be reversed and the case remanded for treatment consistent with this opinion. The district court should be accorded the primary opportunity, as well as responsibility, for framing an appropriate decree of relief.

---

62. *See* Pickering v. Board of Education, *supra*, 391 U.S. at 568, 88 S.Ct. 1731.

63. *See Pickering, supra,* 391 U.S. at 574, 88 S.Ct. at 1737. ("This Court has also indicated . . . that statements by public officials on matters of public concern must be accorded First Amendment protection despite the fact that the statements are direct-

ed at their nominal superiors. Garrison v. State of Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).") *Cf.* NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 616–620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

64. Emerson, Freedom of Expression 16.