ASOCIACION de TRABAJADORES AGRICOLAS de PUERTO RICO and Juan Irizarry Valentin, Individually and in his capacity as president of Asociacion de Trabajadores Agricolas de Puerto Rico and all others similarly situated, Appellants,

v.

GREEN GIANT COMPANY et al.

No. 74–1957.

United States Court of Appeals, Third Circuit.

Argued March 5, 1975.

Decided May 30, 1975.

Sheldon N. Sandler, Wilmington, Del., David M. Sheehan, Amherst, Mass., for appellants; Bader, Dorsey & Kreshtool, Wilmington, Del., of counsel.

Morris, Nicholas, Arsht & Tunnell, Paul P. Welsh, Wilmington, Del., for Green Giant Co.

Robert S. Catz, Burton D. Fretz, Howard S. Scher, Alfonso J. Gonzalez, Migrant Legal Action Program, Inc., Washington, D. C., Michael S. Berger, Camden Regional Legal Services, Inc., Bridgeton, N. J., for amici curiae.

Before ADAMS, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

In the context of an attempt to organize migrant agricultural laborers, the Court is asked to resolve a confrontation between two protected constitutional guarantees. The plaintiffs, a union and its president, demand that they be permitted unconditionally to exercise their First Amendment rights of speech on camp premises where migrant laborers are housed. In contrast Green Giant, which employs the migrant laborers and owns the camp, insists that it is free to enforce its private property rights to exclude the plaintiffs.

Thus the Court is asked to support the position that where laborers reside seasonally in a camp, the property owner's Fifth Amendment right to control its premises must be subordinated to the extent necessary to guarantee full expression of plaintiffs' First Amendment rights of access to, and communication with, the migrant workers.

### A.

The plaintiffs are an unincorporated labor union, Asociacion de Trabajadores Agricolas de Puerto Rico (ATA), and its interim president, Juan Irizarry Valentin. As part of a broad organizing campaign, plaintiffs seek to enlist in the union the temporary workers in the asparagus fields near Middletown, Delaware, fields owned and operated by the defendant, Green Giant Company, a Delaware corporation. The individual defendants, Hickman, Ford, and Owsiany, are law enforcement agents of the State of Delaware.

Green Giant's property is a farm of approximately 3500 acres that fronts a state highway about two miles from Middletown, a town of 2700 inhabitants. During the crop season, which occurs annually from March to June, the fields

are worked by a large number of laborers. In recent years, these laborers have been recruited from Puerto Rico.[1] The terms of the labor arrangements are negotiated between Green Giant and the Government of Puerto Rico, which contracts on behalf of the laborers.

While employed by Green Giant, the workers, about 900 in number, are provided with living quarters on the Green Giant premises. A twenty-acre area contiguous with the fields is fenced off for this purpose. The camp is not generally open to the public, and Green Giant maintains a guard at the entrance to monitor visitors. A "no solicitation" rule is enforced for the alleged purpose of discouraging the proliferation of vice and shoddy merchandise on the property. There is no such rule regarding personal visitors, however.[2]

The camp includes dormitory and mess hall arrangements, as well as facilities for leisure activities and for the sale of snacks and sundries.[3] Aside from an office building and an equipment storage area, the camp is used exclusively for the migrants' living quarters.

Green Giant operates a first-aid station in the camp for handling medical problems. Fire protection is provided by the Middletown Fire Department. For police protection the camp relies on Delaware State and County police services, but in addition Green Giant has contracted for supplemental services with the State Police. Outside of working hours the laborers are not confined to the camp, and are free to go into town for amusement or to purchase items not available at the camp.[4]

During the 1974 growing season, ATA launched an organizing campaign directed at the Green Giant laborers. An initial visit to the Green Giant camp on April 11, 1974, by ATA representatives was followed, on April 20, by a second attempt to enter the camp to speak to the migrant laborers about the benefits of unionization and the services and goals of ATA. After the ATA representatives were informed by state patrolman Owsiany that they were trespassing on posted posted private property, and that they incurred a risk of arrest for criminal trespass, the ATA personnel departed peaceably.

■ Thereafter, on April 29, 1974, plaintiffs initiated this class action for injunctive and declaratory relief in order to assure a guaranteed right of access into the company-owned labor camp. The plaintiffs' claim is based on asserted rights of association, communication and access under the First and Fourteenth Amendments, and on the Civil Rights Act, 42 U.S.C. §§ 1983, 1985.[5]

---

1. The Wagner-Peyser Act, 29 U.S.C. § 49b (Supp.1975), and the Statutes of the Commonwealth of Puerto Rico, 29 L.P.R.A. § 525 et seq. (1966) constitute the statutory schema under which they enter the United States.

2. It is not disputed that the 1974 employment contract, available to the Court only in a Spanish language version, contains a clause specifically protecting the workers' right to receive visitors. Some discussion has occurred in the district court regarding possible violations of this contractual right. However, plaintiffs did not plead any violation of this contract right, and such issue is not presently before us.

3. The district court in its opinion has described the migrant labor camp in some detail. 376 F.Supp. 357, 358–59 (D.Del.1974).

4. A periodic bus service provides transportation to town. However, some dispute exists regarding the practical availability of such transportation. There was no evidence as to how often the farm workers took the bus to town, or how frequently they may have walked the two miles into town.

5. Although this is a labor organizing dispute, there is no jurisdiction under the National Labor Relations Act, since agricultural laborers are expressly excluded from the Act. 29 U.S.C. § 152(3) (1973). Under the NLRA, organizers of groups covered by the Act can utilize statutory rights of access to employees under delineated circumstances. NLRB v. Stowe Spinning Co., 336 U.S. 226, 69 S.Ct. 541, 93 L.Ed. 638 (1949); NLRB v. Tamiment, Inc., 451 F.2d 794 (3d Cir. 1971); NLRB v. Lake Superior Lumber Corp., 167 F.2d 147

Plaintiffs maintain that the camp represents an integrated community for the workers, where nearly all their needs are met. Thus the plaintiffs contend that, as to the workers, the camp operates as a company town and stands in the shoes of the state for purposes of the First and Fourteenth Amendments, which protect plaintiffs' exercise of speech and association. Since the camp is the functional equivalent of a town, plaintiffs assert, the laborers do not relinquish any of their First Amendment rights when they cross its threshold. The argument continues that, as with any other town, those who would speak to the inhabitants must have constitutionally protected access to them where they live.[6]

Affidavits and legal memoranda were submitted to the district court and a hearing on a preliminary injunction was held May 23, 1974. The district court concluded, in an opinion denying the preliminary injunction, that: "Because the Court finds on the present facts that the Green Giant labor camp has not assumed in any significant degree the functional attributes of public property devoted to public use, that property cannot be held to be subject to the commands of the First and Fourteenth Amendments."[7]

On June 7, 1974, by letter to the district court, the plaintiffs made "the extraordinary request" that the hearing regarding issuance of a permanent injunction be scheduled prior to the end of June, when the migrant laborers would terminate their employment and depart. The migrant laborers' testimony, the letter claimed, would be decisive in the plaintiffs' case. Plaintiffs stated that they intended to present evidence bearing on: the physical and psychological isolation of the migrants' life in the labor camp; life in the camp as it related to work and leisure; and policies of visitation to the camp and excursions by workers out of the camp. The plaintiffs also suggested that at the hearing they would demonstrate interference by the defendants with attempts by ATA to reach the migrants outside the camp grounds, by mail and by telephone.

Green Giant strenuously opposed the accelerated proceeding sought by ATA. First, Green Giant contended, a precipitous hearing would foreclose it from pursuing proper discovery and trial preparation. In any event, Green Giant alleged, if its pending motion for summary judgment were granted,[8] the need for any hearing whatever would be eliminated. Green Giant's position was that the plaintiffs could present no facts that would justify the requested relief because the camp was not open to the public and did not function as a town.

(6th Cir. 1948). Hudgens v. NLRB, 501 F.2d 161 (5th Cir. 1974), *cert. granted*, 420 U.S. 971, 95 S.Ct. 1391, 43 L.Ed.2d 651 (1975). For a comparison of the analysis under the First Amendment and the considerations that govern in an NLRA situation, see Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972); NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956).

Since no statutory right of access appears to govern the case at hand, the plaintiffs rely solely on their claims under the Constitution. Petersen v. Talisman Sugar Corp., 478 F.2d 73 (5th Cir. 1973) (rejecting a statutory right of access under the Wagner-Peyser Act, 29 U.S.C. § 49b).

**6.** Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). The right of the speaker, or distributor of information, is the correlative of the right of the recipient to obtain information. In this case the rights are asserted by the disseminators, who may, under the precedents cited above, sue to protect their own interests in distributing information. Alderman v. Philadelphia Housing Authority, 496 F.2d 164, 168 and n.17 (3d Cir. 1974).

**7.** 376 F.Supp. at 361.

**8.** The motion by Green Giant for summary judgment, unaccompanied by a legal memorandum in support, read in its entirety:

Defendant Green Giant Company hereby moves, pursuant to F.R.Civ.P. 56, that the Court enter summary judgment in its favor on the ground that there is no genuine issue as to any material fact and defendant Green Giant Company is entitled to a judgment as a matter of law.

Hence, Green Giant urged that, as a matter of law, plaintiffs could not maintain a right of entry onto Green Giant's private premises.

The district court responded with an order on June 12, 1974, denying plaintiffs' request for an immediate trial. Several considerations undergirded its decision. The district court stated that it was reluctant to proceed in a manner that "would work injustice and deny an adequate opportunity for a full and fair hearing to all the parties." Immediate scheduling of depositions of the migrant laborers, which Green Giant had agreed not to impede, would, the district court found, adequately protect the plaintiffs' interests in preserving testimony for trial. The district court also noted that, although the testimony "may have some bearing on the final result of the case, the overriding issue, according to the Supreme Court cases, will be the public nature of the labor camp." Finally, the district court observed that the plaintiffs did not appear to have explored reasonable access to the laborers aside from the possibility of entering the Green Giant camp.

Without undertaking the anticipated depositions of the workers, the plaintiffs abruptly requested the district court to grant the defendants' summary judgment motion and enter final judgment against the plaintiffs. In effect, plaintiffs' motion recited that, based on the district court's opinion and orders, plaintiffs understood the district court to hold the view that the critical element in plaintiffs' case was the public nature of the camp. The plaintiffs inferred, somewhat unjustifiably, that only if this were established would the district court find state action, so as to permit First Amendment rights to arise on the Green Giant premises. The plaintiffs conceded that, if the public nature of the camp were an essential element in their case, they could present no additional evidence to support their right of access. But the plaintiffs asserted that, under the theory of the case advanced by them, the evidence already in the record sustained their position.

Thereupon, the district court entered an order denying all relief to the plaintiffs.[9] This appeal followed.[10]

### B.

First and Fourteenth Amendment freedoms of speech and communication constitute important rights, fundamental to our notions of ordered liberty,[11] and access to information enabling conscious choice is vital to our democratic way of life. Also protected by the Constitution is the right to hold property free from unwarranted intrusions.[12]

For the most part these rights co-exist harmoniously. On occasion, however, such as in the present case, they are hurled against each other in pitched battle. When this occurs, courts must apply the guiding precepts that the Supreme Court has fashioned. To sustain a dynamic equilibrium between these two liberties where they clash, courts have had to focus closely on the factual configuration of each case as it arises. Where it has been found necessary, courts have forged an accommodation between the conflicting rights.[13]

9. The order also certified the plaintiffs as a class. No cross appeal has been taken from the class designation.

10. It is regrettable that the Court must consider the substantial First Amendment question presented here in the absence of a properly developed factual record. However, since the parties joined in the motion for summary judgment, the abbreviated record became inevitable.

11. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); Alderman v. Philadelphia Housing Authority, 496 F.2d 164 (3d Cir. 1974).

12. See Lloyd Corp. v. Tanner, 407 U.S. 551, 567, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

13. E. g., Amalgamated Food Employees v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).

■ The exercise of First Amendment rights ordinarily cannot be prohibited on public property open to the general public.[14] However, before a servitude of First Amendment freedoms may be imposed on privately held property, that property must be invested to some degree with the physical or functional attributes of public use.[15]

The watershed case sustaining First Amendment rights of expression on private property is Marsh v. Alabama.[16] In Marsh, a Jehovah's Witness was arrested for trespassing when she distributed religious tracts on the streets of Chickasaw, Alabama. Although Chickasaw appeared to be an ordinary municipality, the town property, including the entire commercial district and the streets, was owned privately by a corporation. The town asserted its ownership rights to sustain the conviction. The defendant insisted that, for First Amendment purposes, the corporation was indistinguishable from the state, and that consequently her conduct was a protected exercise of First Amendment freedoms. The Supreme Court reversed the conviction, holding that the exercise of First Amendment freedoms was preserved intact in the town.

Two coordinate bases sustained the Court's holding. First, Chickasaw was functionally and structurally quite like other towns of similar size and situation, save that its title was held by a private corporation. Second, the town was entirely open to the public. Ingress and egress to the streets and buildings were unimpeded; in fact, the property owned by the corporation was not distinguished from surrounding property by divisions or markers of any sort.

Subsequent decisions have identified with greater precision the requisite elements that supported the holding in Marsh. In particular, the Supreme Court has etched the tests to be applied in the shopping center context. At variance with the conventional small municipality that existed in Marsh, the shopping center is an environment where both openness to the public and provision of municipal services are muted.

Two cases involving shopping centers present narrowly disparate facts. In Amalgamated Food Employees v. Logan Valley Plaza, Inc.[17] a food store in a privately-owned shopping center was the site of a campaign to organize the employees. Non-employee organizers picketed the private property in front of the store that was used by the public for entrance. The Supreme Court held that the pickets were protected by the First Amendment from prosecution under state trespass law. In Lloyd v. Tanner, however, critics of the Viet Nam conflagration were permissibly exposed to arrest for trespass when they attempted to issue leaflets in a private shopping center.

The shopping centers in both Logan Valley and Lloyd were open to the public for shopping purposes. Although each center was compared by the Supreme Court to the business district of the Town of Chickasaw, neither afforded an exact parallel to the self-contained community of Chickasaw. Unlike Marsh, therefore, the shopping centers in Logan Valley and Lloyd had not as-

14. Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972); Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Where public property is not generally open to the public, exercise of First Amendment rights of access and expression may be restricted. Adderley v. Florida, .385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (jail); Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (national security area).

15. See Lloyd v. Tanner, where Justice Powell wrote, "[I]t must be remembered that the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on state action, not on actions by the owner of private property used nondiscriminatorily for private purposes only." 407 U.S. at 567, 92 S.Ct. at 2228.

16. 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).

17. 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

sumed the cloak of government to such an extent as to be subjected automatically to the full panoply of First Amendment rights that each passerby wished to exercise. Nor was a general dedication of the property to the public or municipality discerned in the shopping center developments.

■ As *Logan Valley* and *Lloyd* make clear, however, even though the use of property does not replicate a whole town in structure or function, nonetheless in certain circumstances private property might become subject to First Amendment demands. In *Lloyd* a carefully calibrated calculus was devised for determining when First Amendment rights may take precedence over property rights for limited purposes. The Supreme Court in *Lloyd* found two distinctions between that case and *Logan Valley,* and indicated a third possible factor of importance. First, the Court held, "It would be an unwarranted infringement of property rights to require them to yield to the exercise of First Amendment rights under circumstances where adequate alternative avenues of communication exist." [18] Furthermore, the Court held—in contradistinction to *Logan Valley*—that the expression in *Lloyd* "had no relation to any purpose for which the center was built and being used." [19] The third suggested factor in *Lloyd* is that a demonstration of discriminatory denial of access might create an enforceable right of entry.[20]

■ In short, what the Supreme Court appears to have decreed is that where, as in *Marsh,* a facility in its operations is indistinguishable from a town, it acquires the First Amendment burdens of a municipality, and it cannot assert its title to prohibit the expression of First Amendment rights by others. Where the private enterprise has some, but fewer than all, of the attributes normally associated with a community, a composite set of facts, tested under the formula of *Lloyd,* might warrant an accommodation of property rights so as to allow a circumscribed access to the property and the exercise of freedom of expression.

Mr. Justice Black, author of the *Marsh* opinion, dissented in *Logan Valley.*[21] For a proper resolution of the First Amendment issue presented in *Logan Valley,* according to Mr. Justice Black, the Court must first ascertain—apparently as an abstract matter—whether there is state action. If, as in *Marsh,* a functional analysis reveals that the property operates in effect as an adjunct of the state, then the First Amendment freedoms must be fully tolerated, as they are by the state itself. By contrast, where the operation of the property cannot be deemed state action, Mr. Justice Black would find Fifth Amendment property rights immune from claims under the First Amendment.

In *Logan Valley* and *Marsh,* it would appear that the Court eschewed the approach adverted to by Mr. Justice Black, preferring a more chiaroscuro-type test. Under the analyses of both the majority and the dissent in *Lloyd,* no preliminary abstract determination of state action seems to be undertaken. Rather, a multifaceted inquiry is employed, comprehending the nature and attributes of the property, the relation of the expression to the property, and other avenues of effective expression. Limited First Amendment rights may be held enforceable where limited public functions are performed. Thus, although the theory propounded by Mr. Justice Black in his dissent in *Logan Valley* appears to have considerable force, it has not been adopted as the rationale of the Court.

C.

In the case here, Green Giant has relied upon the argument that, regardless

---

18. 407 U.S. at 567, 92 S.Ct. at 2228.

19. *Id.* at 564, 92 S.Ct. at 2226.

20. In Spock v. David, 502 F.2d 953 (3d Cir. 1974), *cert. granted,* 421 U.S. 908, 95 S.Ct. 1556, 43 L.Ed.2d 773 (1975), the question is posed of discriminatory denial of access to selected individuals on an Army base.

21. 391 U.S. 308, 327, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968).

of all other factors, its property is not open to the public and therefore First Amendment rights may be exercised only at Green Giant's discretion. ATA contends that, since the camp is similar to a town, the camp must be open to all. The court cannot accept either of these polarized positions as the rule governing the exercise of First Amendment rights.

■ Access to the camp is limited and, where permitted, is monitored. Indeed, it is this very point to which plaintiffs object. Because the Green Giant migrant labor camp is not generally open to the public, we are constrained to conclude that the camp, unlike Chickasaw, need not permit automatic and wholesale entry by all who assert First Amendment rights.

In a number of other respects, however, and in particular from the vantage of those who live within its borders, the camp presents features akin to the company town in *Marsh*. During its seasonal operation, the camp seems to function, in large measure as the workers' community. The 900 inhabitants work, eat, sleep and may take their leisure on Green Giant's property. On the premises the workers can purchase their immediate needs. Although the camp is not wholly autonomous, Green Giant undertakes to provide a variety of services similar to those that a municipality might supply.

■ We do not agree that by removing the element of openness to the public, an owner of private property enjoys an absolute power to forbid the exercise of First Amendment liberties on its premises. Rather, it is possible that the camp community, like the shopping centers, might under some circumstances be forced to accommodate limited First Amendment claims.

■ Applying the analysis of *Lloyd*, the Court must consider whether the expression in question relates to the nature of the property or its uses, and whether other reasonable options exist for reaching the desired audience with the intended message. As regards the relation between the property and the substance of the expression, we conclude that—as in *Logan Valley*—the message at issue here is particularly linked to the property and the use to which it is put. The information is directed at the workers residing at the camp and concerns the conditions at the camp and the unionization of the laborers. Thus, the first condition of *Lloyd* would appear to be satisfied.

But the Supreme Court urged caution in *Lloyd*, lest courts "diminish property rights without significantly enhancing the asserted right of free speech." [22] Therefore, to complete the *Lloyd* equation for exercise of First Amendment rights on private property, the plaintiffs had the further burden of proving that no reasonable substitutes existed for conveying their message to the listeners. [23] It was thus indispensable to their case that plaintiffs present evidence to demonstrate that alternative access to the workers was unavailable or would be ineffective. For this purpose, it would have been helpful to document for the Court the physical, psychological and linguistic isolation of the workers. The plaintiffs might also have pursued proof of the impracticability of other avenues for reaching the workers outside the camp's perimeter. [24]

Rights of access have been successfully sought in other situations relating to migrant labor camps, where the theoretical

**22.** 407 U.S. 567, 92 S.Ct. at 2228.

**23.** *Tamiment, supra* note 5, although a case under the NLRA, is instructive regarding the nature of the judicial inquiry into alternative possibilities for reaching an audience under comparable circumstances.

**24.** An uncontradicted affidavit submitted to the district court in support of the preliminary injunction disclosed that Officer Owsiany prohibited ATA from talking and distributing literature on the road outside the camp. No information was presented regarding traffic conditions or applicable laws or ordinances from which the Court could draw a conclusion that such refusal was unreasonable. This was the clearest direct proof in the record of an unavailing alternative means of communication.

basis for allowing admittance was supported by proof. None of these cases adopted exactly the reasoning followed in the present case. Generally, decisions were reached only after full consideration on the merits.

Diverse theories have supported these decisions. The Fifth Circuit, in Petersen v. Talisman Sugar Corp.,[25] decided that on the facts before it the case fell squarely within the *Marsh* rationale. The evidence in the record there pointed unmistakably to the existence of a functional municipality on the property of the grower and to the total isolation of the workers on the plantation. Indeed, the insular position of the plantation in *Talisman* rendered unfeasible all approaches to the employees other than admittance to the grounds. The Fifth Circuit found that the company "forfeited the broad right . . . to enforce strictly a 'No Trespassers' policy.'"[26] It added that "the company must accommodate its property rights to the extent necessary to allow the free flow of ideas and information between the plaintiffs and the migrants."[27]

District courts presented with related situations have decreed rights of access into migrant labor camps, determining either that the camps must permit entry by any interested person with lawful purpose or that more limited access must be permitted, to assure that migrant workers are not "encased in a cocoon" shielded from the outside world.[28]

In Franceschina v. Morgan, the district court found as fact that, at the labor camp at issue in that case, "[a]lthough theoretically free to travel about when not at work, most migrants spend their leisure time in camp. . . . [Furthermore, they] are reluctant to discuss matters with persons represented by plaintiffs in [public] places."[29] The court further held that migrant laborers, like other citizens "residing in their own homes,"[30] were entitled to receive information and visits from governmentally funded agencies devoted to migrant assistance, and from labor organizers, subject only to the migrants' discretion and not that of the company.

The plaintiffs in Folgueras v. Hassle[31] represented a variety of O.E.O.-funded groups and private migrant-aid organizations. The proof disclosed compelling reasons for plaintiffs to enter the premises, and specified occasions where no substitute for admittance would be adequate. Testimony reported abusive and violent conduct by the owner, and exclusion of plaintiffs both in emergency situations and where authorized inspections necessitated on-site investigations. Based on facts such as these, and with ample evidence presented, the court held that the plaintiffs were entitled to admittance. The court theorized that the migrants could not constitutionally be deprived of reasonable access to the plaintiffs or other visitors.

The district court in Velez v. Amenta[32] required the growers association that operated the labor camp to permit accessibility to the camp by visitors, subject to reasonable regulation.[33] Extensive evidence was received and 85 supportive affidavits from workers were filed.

While differing analyses and a variety of factual circumstances prevailed in the above cases, proof was submitted in each to justify the findings and legal conclusions of the court. The plaintiffs in the present case have adopted a theory of recovery that has channeled the conduct

**25.** 478 F.2d 73 (5th Cir. 1973).

**26.** *Id.* at 83.

**27.** *Id.*

**28.** *See also* State v. Shack, 58 N.J. 297, 277 A.2d 369 (1971); People v. Rewald, 65 Misc.2d 453, 318 N.Y.S.2d 40 (1971).

**29.** 346 F.Supp. 833, 835 (S.D.Ind.1972).

**30.** 346 F.Supp. at 838.

**31.** 331 F.Supp. 615 (W.D.Mich.1971).

**32.** 370 F.Supp. 1250 (D.Conn.1974).

**33.** The plaintiffs in *Velez* included Irizarry, the individual plaintiff in this case.

of the case and the evidence they have chosen to submit. At this juncture, plaintiffs are bound by their performance in the district court.

Plaintiffs sought relief predicated only on the broad proposition that any person seeking admittance to the Green Giant labor camp for lawful purposes should be granted entrance to the premises to exercise fully rights of association, peaceable assembly and speech, including labor organizing. Under the precedents, we decline to construe the plaintiffs' rights so comprehensively.

It is true, as noted above, that some set of facts might be proved to force the operators of a migrant labor camp to permit entry by outsiders. Such proof would need to include evidence of the sort that plaintiffs in their June 7, 1974 letter in effect conceded was essential to their case.

The Court is not unaware that, for socio-economic and other reasons, many of this nation's migrant workers lead lives pinched by poverty, ignorance and powerlessness.[34] In order to combat these deprivations, many worthwhile programs have been developed to help the migrants lead less encumbered existences. For the migrants to change the contours of their lives, they must be familiar with avenues of self-help, and assistance from others, available to them. It may be that certain employers do not consider it in their interest to have workers who are organized, educated and aware of their rights. Such employers might, therefore, be tempted improperly to isolate the workers in an impenetrable fortress, as it were. Where evidence suggests that this is the situation, the Court wiill respond appropriately.

In the present case, however, there is no evidence tending to prove that Green Giant, as a matter of course, mistreats its migrant laborers. Moreover, no instances of a failure to comply with federal, state or local law have been cited to the Court. Unlike the situation in *Folgueras,* no case is made out that the union had a particularized need to gain entry to the camp, and that access to the workers at a different location could not substitute.

The evidence submitted by affidavit, that the district court found did not suffice for the grant of a preliminary injunction, was in no way supplemented by the plaintiffs before they moved for final disposition of the case, although the means to obtain further proof, through depositions or otherwise, were available. There simply are not enough facts in the present record pertaining to the circumstances prevailing at the Green Giant camp to say that the district court erred in not ordering relief for the plaintiffs.[35]

Plaintiffs cannot presume that the Court is free to take judicial notice of the plight of the nation's farm workers and then infer that such general characteristics pertain in a discrete situation before the Court. In addition, the Court may not conclude, in the absence of direct proof, "that Green Giant or its agents will interfere or obstruct the passage of mail to the camp residents in violation of 18 U.S.C. §§ 1701 and 1702 or that [Green Giant] would attempt to restrict them from attending any meeting called by plaintiffs at some public or private place other than upon Green Giant's private property."[36] The burden of proving such possibilities is on plaintiffs.

**34.** The Migratory Farm Labor Problem in the United States, Senate Committee on Labor and Public Welfare, Subcommittee on Migratory Labor, S.Rep.No.91–83, 91st Cong., 1st Sess. (see especially discussion regarding difficulty of access to camps, at 49). Chase, The Migrant Farm Worker in Colorado—The Life and the Law, 40 Colo.L.Rev. 45 (1967); Sherman & Levy, Free Access to Migrant Labor Camps, 57 A.B.A.J. 434 (1971); duFresne & McDonnell, The Migrant Labor Camp: Enclaves of Isola-

tion in Our Midst, 40 Fordham L.Rev. 279 (1971); Note, 46 N.Y.U.L.Rev. 834 (1971).

**35.** Since new events may transpire and since the facts in the present case were never fully developed, we express no view whether plaintiffs might satisfy a court of the validity of certain First Amendment claims, in a properly presented case concerning a subsequent growing season.

**36.** 376 F.Supp. at 361.

The Supreme Court has indicated that a private property owner may be obliged to accommodate First Amendment expression on its property in limited situations. If, under private ownership, the equivalent of an integrated, open community of citizens flourishes, then—as in *Marsh*—the First Amendment freedoms of all are preserved and must be respected as they would be on public lands. Also, where many but not all the qualities of public life are mirrored in the use to which private property is put, a narrower vein of First Amendment liberties may nevertheless be carved out, if a party makes the showing demanded by *Lloyd*. We cannot, consistent with such view of the First Amendment precedent in this area, accept the all-encompassing theory of admittance advanced by the plaintiffs, and yet they have not produced adequate proof to sustain their claim on a narrower legal basis.

Accordingly, we cannot say that error was committed by the district court when it granted summary judgment for the defendants upon the plaintiffs' request, in light of the record then before the court. An order will be entered affirming the judgment of the district court.